[Nos. 29060, 29061, 29062. Department One. November 18, 1943.]

*In the Matter of the Appeals by Employees of the* POLSON LUMBER & SHINGLE MILLS.

*In the Matter of the Appeals by Employees of the* BAY CITY LUMBER COMPANY.

*In the Matter of the Appeals by Employees of the* E. C. MILLER CEDAR LUMBER COMPANY.[1]

[1]Reported in 143 P. (2d) 316.

The Attorney General, George W. Wilkins, and Frank W. Foley, Assistants, for appellant.

Oscar A. Zabel and Philip J. Poth, for respondents.

JEFFERS, J.—We are here concerned with three appeals by the commissioner of unemployment and placement from three judgments entered by the superior court for Grays Harbor county, which judgments in each case reversed the order made by the commissioner and allowed benefits to the claimants involved. The cases are entitled: "In the Matter of the Appeals by Employees of the Polson Lumber & Shingle Mills," "In the Matter of the Appeals by the Employees of the Bay City Lumber Company," and "In the

Matter of the Appeals by the Employees of the E. C. Miller Cedar Lumber Company." The cases were heard and considered separately by the department and by the trial court, and a separate judgment was entered in each case. They will hereinafter be referred to as the "Polson Mill case," the "Bay City case," and the "Miller case." By stipulation approved by this court, the three cases were consolidated on this appeal, for the purpose of briefs and argument. The stipulation provided that the consolidation should not prevent argument and consideration of each case on its own merits.

The commissioner has filed, and we have before us, his record in each case. The Polson Mill case was initiated by the filing of some fifty-seven claims by employees of that mill for unemployment benefits. By what is termed supplemental determination, all claimants were denied benefits, for the reason that it was decided that their unemployment was due to a labor dispute. On a hearing before the appeal examiner, the determination of disqualification was affirmed and, on a review by the commissioner, the decision of the appeal examiner was affirmed. Claimants then appealed to the superior court, where the order of the commissioner was reversed and benefits allowed. The commissioner has appealed to this court from the judgment entered.

The Bay City case was commenced by the filing of some forty-six claims for benefits by employees of that company. By the supplemental determination, claimants were denied benefits for the same reason as in the Polson Mill case. The appeal examiner thereafter reversed the supplemental determination and held claimants were entitled to benefits. The commissioner reviewed the decision of the appeal tribunal, and found that there was a labor dispute at the company's establishment and that the unemployment of the claimants was due to a stoppage of work caused by such dispute; that the company's employees, the benefit claimants, had given notice to the company, through the local union to which they belonged and which represented them in collective bargaining purposes, that the logs which were

in possession of the company were unfair and that the employees would not work thereon. Based upon these findings, the commissioner reversed the decision of the appeal tribunal and held claimants not entitled to benefits. On appeal by claimants from the order of the commissioner, the trial court reversed the order of the commissioner and allowed benefits to the claimants. This appeal by the commissioner followed.

The Miller case was instituted by the filing of twelve claims by employees of that company. Four of these claimants were employees of the shingle mill, the other eight employees of the sawmill and planing mill. By the supplemental determination, benefits under the act were denied all claimants. On a hearing before the appeal examiner, the determination of disqualification was reversed and all claimants were declared eligible for benefits. On a review of the decision of the appeal tribunal, the commissioner affirmed the decision of the appeal tribunal as to the four men employed in the shingle mill, but found that the eight men employed in the sawmill and planing mill were disqualified from receiving benefits, for the reason that their unemployment was due to a stoppage of work which existed because of a labor dispute at the premises at which claimants were employed, and that the claimants had failed to show to the satisfaction of the commissioner that they were not participating in, or directly interested in, the labor dispute which caused the stoppage of work. No appeal was taken from the order of the commissioner relative to the four men employed in the shingle mill. The eight men denied benefits appealed to the superior court, where the order of the commissioner was reversed and they were allowed benefits. The commissioner has appealed from the judgment entered as to the eight men mentioned.

The following facts are not disputed and, we think, are applicable to all three cases: The Polson Mill is located at Hoquiam, on the Hoquiam river, and the Bay City and Miller mills are located at Aberdeen, on the Chehalis river. Each of these mills, on or about May 19, 1941, entered into

an agreement with Sawmill and Timber Workers Union, Local 3-2, I.W.A.—C.I.O. Under this agreement, the employers, among other things, agreed to recognize this union as the sole collective bargaining agency for all employees. The agreement also contained a "union shop" clause. The agreement in each case was signed by J. E. Fadling, president of Local 3-2, I.W.A., and Art Anderson, recording secretary. It was negotiated on the part of the mills through an employers' negotiating committee.

On or about May 9, 1941, a series of strikes were called by the logger union to enforce certain demands against the logging industry. These strikes were settled about June 16, 1941. On May 22, 1941, each of the mills had a supply of logs in its mill pond adjacent to the mill, and also a considerable quantity of logs in storage in log booms tied up either on the Chehalis or Hoquiam river, not far from the mills. It is not disputed that the logs actually in the mill ponds, as well as those in storage, had been cut, rafted, and stored prior to the outbreak of the logging strike.

On May 22, 1941, Sawmill and Timber Workers Union, Local 3-2, I.W.A., which was the authorized and recognized exclusive bargaining agent for the sawmill employees in each of the mills, sent the following letter or notice to the management of each mill:

"This will officially inform you that the Sawmill and Timber Workers Union, Local 3-2 IWA has placed all outside rafts and incoming ocean rafts on the unfair list.

"And that any operation that proceeds to cut any unfair logs will be subject to having their entire operation placed on the unfair list.

"For any further clarification, contact the local union office.                              Yours truly,
          .                        "Art Anderson, Rec. Sec'y."

After receipt of the above notice, each of the three mills continued to operate until all the logs in the mill ponds were used up, when they closed the sawmill operations and the claimants here involved became unemployed. There were some operations which continued for a time, but with them we are not concerned.

Apparently in order to be sure that the stored logs which had been placed on the unfair list be not moved to the mills, pickets were placed on the log rafts. So far as this record shows, none of the pickets was a sawmill employee. Pickets were at first placed on the logs in the mill ponds, but they were removed by the union; however, the pickets remained on the outside or storage logs.

The testimony shows that at the time the mills shut down each of them had sufficient logs in storage to permit them to continue normal operation during the period the mills were shut down. It does not appear that there was any controversy or dispute between the mill employees and the employers, other than the right of the employers to bring into the mill and cut the stored logs declared unfair by the union during the period of the loggers' strike.

In addition to the facts hereinabove set out, the record shows that, in the Polson Mill case, after receipt of the above notice by the management, and about May 23rd, the plant shop committee, provided for in the working agreement of May 19th, composed of mill employees and being a committee of Local 3-2, met with a representative of the company and with a strike committee of the loggers. At this meeting, as shown by the testimony of Mr. Koune, manager of the Polson Mill, the company contended that the logs in storage should not be declared unfair, and informed the committee that the mill would continue to operate if the logs were released. However, both the shop committee and the loggers' strike committee continued to maintain that the logs were unfair, and informed Mr. Koune that the men would not work on the logs if they were brought in. Mr. Koune further testified that they had a "couple" of meetings with the shop committee, in an attempt to get them to agree to release the logs, but the committee would not so agree.

It does not appear that, at any time during the time the mill was closed down, the claimants, either individually or through their union, offered to return to work, or indicated

they would work on the stored logs. Mr. Koune was asked the following question:

"Q. Now, what was the reason for the sawmill employees, for the sawmill closing down on May 27? A. Because the union had notified us that we must not bring these logs in, that they were unfair, that the crew would not work on these logs."

In the Bay City case, Mr. Polson, vice-president of the company, was asked the following questions:

"Q. Now, directing your attention to the date of May 9, 1941, which date, for your information, was the date of an effective strike being declared in certain logging operations in this vicinity, and I will ask you if you were notified by your sawmill employees on or about that date of any strike that they had declared against your operations? A. Well, on May 22, under that date, I have a letter from Art Anderson, recording secretary of the Sawmill & Timber Workers Union No. 2, in which he states, [letter of May 22nd hereinbefore set out read]. Q. And you received that letter, did you? A. Yes. Q. On the date of May 22 or 23? A. 23rd. . . . Q. And the reason for the shut down of course was —what do you give as the reason for the shut down of operations? A. The reason we couldn't operate was because of word from the union of which we have our agreements with, that the logs which we owned could not be cut. Q. You refer again to the logs that were in the mill storage pond? A. Yes, they were in rafts across the river where we normally tie rafts."

Mr. Polson also testified that he attempted to get two tug boat companies to deliver a raft of the stored logs to the mill, but they refused, informing him that they could not deliver the logs because there were pickets on them. It further appears from Mr. Polson's testimony that the company contended the logs in storage were not "hot." The following question was propounded to Mr. Polson:

"Q. And did you have anything else you would like to add? A. There is one thing that has not been brought out, which I think is part of this case, and that is the logs in the logging company booms were not hot. They were rafted out into rafts and towed down the river, and they were still cold, but the minute that a line was put aboard them to bring them to a mill, they then become hot."

Mr. Polson also testified that, after receipt of the notice from the union, he contacted Mr. Butorach, a member of Local 3-2 and shop steward at the mill, and asked him if the logs in storage were "hot," and that Mr. Butorach contacted the union,

". . . went down on the rafts and asked the pickets themselves if they had contacted the union and what had been told them, and they said the logs were hot."

It does not appear that Mr. Butorach or any of the employees of the mill offered to work on the outside logs if brought in.

In the Miller case, Mr. Miller, manager of the mill, testified that, immediately prior to May 22, 1941 (the date of the union notice), his company towed all the logs it could into its mill pond, as they expected some such action as was taken by the union. He further testified that after receipt of the notice no more logs were brought in, as the company did not consider it could do so. Mr. Miller was asked:

"Q. So that can it be said that this shutdown was not caused by any labor trouble in your plant or connected with your particular plant? A. Only so far as supplies of logs was concerned. . . . Q. Now, you did not state why you shut down on the 6th of June, you ran out of logs? A. We had plenty of logs but they would not let them bring them out to the mill to saw. . . . Q. Did you make any attempt to have any of these rafts delivered to you after the strike was called? A. No. sir. Q. Why not, Mr. Miller? A. Well, I have a letter from Art Anderson, under date of May 21. [Letter received in evidence.] Q. Do you know who Art Anderson is, Mr. Miller? A. He is secretary of the union. I know him when I see him. . . . Q. Do you remember whether you brought in any rafts after the strike was called on the 9th? [Loggers' strike] A. No, we didn't consider that we could do that. Q. And because of this letter you say you did not receive any new rafts, you did not requisition any? A. Yes, we had them on hand but of course we couldn't get them in."

The record in this case is silent as to the attitude of employees of the company relative to the outside logs, and whether or not they would work on them if they were

brought in to the mill, other than as disclosed by the action of their bargaining agent, Local 3-2.

In all three cases, as soon as the loggers' strike was settled and the logs in storage released, the mills resumed operations and the claimants went back to work.

In each of the three cases, the trial court, on January 19, 1943, made and entered the following memorandum opinion:

"In this case I am of the opinion that there wasn't any labor dispute so far as the employees of the [name of company] were concerned. The only reason the mills were shut down was because the tug boat would not haul logs to this plant. There was no dispute whatsoever between the employers and the employees."

The trial court found in each case that the commissioner's determination that the unemployment of respondents was due to a stoppage of work which existed because of a labor dispute at their respective establishments was wholly without evidential support, at variance with and unrelated to the undisputed facts presented in the record; that the cessation of furnishing work to claimants by the employers was caused by a lack of logs; that the immediate cause of lack of logs was the failure of the tug boat company to haul logs; that claimants were engaged in an employment separate and apart from that of the striking loggers; that claimants in no manner attempted to interfere with the obtaining of logs; and that the employers shut down the plants when their usable log supply became exhausted, without attempting to secure more logs. Other findings were made by the trial court, but we think those set out above clearly show the theory of the trial court.

Appellant commissioner makes eight assignments of error, to wit: The court erred in reversing the findings of fact of the commissioner; in determining that the findings of fact of the commissioner lacked evidential support, and were the result of arbitrariness and caprice; in its pronouncement of those facts as to which it declared there was no room for difference of opinion; in finding that respondents' unemployment was not due to a stoppage of work

caused by a labor dispute; in substituting its judgment for that of the commissioner on questions of fact; in refusing to accept the commissioner's proposed findings of.fact and conclusions; in allowing benefits to respondents; and in allowing excessive attorneys' fees to respondents' attorneys.

The applicable statute is Rem. Rev. Stat. (Sup.), § 9998-105 (since amended and now appearing as Rem. Supp. 1941, § 9998-105), which provides:

"An individual shall be disqualified for benefits: . . .

"(e) For any week with respect to which the commissioner finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided*, That this sub-section shall not apply if it is shown to the satisfaction of the commissioner that:

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided*, That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this sub-section, be deemed to be a separate factory, establishment, or other premises."

Respondents' position is shown by their statement of questions involved:

"Where sawmill workers are employed by one company, and loggers who are employees of another company, but members of the same union, call a strike and refuse to deliver logs, by reason of which the sawmill is required to shut down, does a labor dispute exist under Sec. 9998-105 (e) Rem. Rev. Stat. Wash., thus disqualifying sawmill employees for unemployment compensation where said sawmill workers are in a separate establishment, and are willing to work, and had no trouble or dispute of any kind with their employer?"

■ In view of the fact that the trial court found that the finding of the commissioner, that respondents' employment was due to a stoppage of work caused by a labor dispute at the establishment wherein they were employed, was wholly without evidential support, let us again look to the statute and some of the decisions which deal with the power of the court in reviewing the findings of fact of the commissioner.

Rem. Supp. 1941, § 9998-106(i), which deals with "court review," provides for an appeal to the superior court, and states that:

". . . such appeal shall be heard as a case in equity but upon such appeal only such issues of law may be raised as were properly included in his application before the appeal tribunal. . . .

"If the court shall determine that the Commissioner has acted within his power and has correctly construed the law, the decision of the Commissioner shall be confirmed; otherwise, it shall be reversed or modified. . . .

"In all Court proceedings under or pursuant to this act the decision of the Commissioner shall be prima facie correct, and the burden of proof shall be upon the party attacking the same."

The above section was by this court for the first time construed in the case of *In re St. Paul & Tacoma Lbr. Co.,* 7 Wn. (2d) 580, 110 P. (2d) 877, particularly as to the power of the court in reviewing findings of fact made by the commissioner. After citing a number of cases, we stated (p. 593):

"The legislature, in passing this act, was conscious of the provision of the workmen's compensation act, which reads:
" ' . . . but upon such appeal may raise only such issues of law or fact as were properly included in his application for rehearing, or in the complete record in the department.' Rem. Rev. Stat., § 7697 [P. C. § 3488].
and of our decisions interpreting that section. In drafting the act under consideration, it evidently patterned the appeal provisions from that of the workmen's compensation act and *with the evident intent of limiting the power of the court in reviewing questions of fact under the new act,* because it left out the words 'or fact' which are contained in the old act.

"Looking to the quoted portion of the act in question relative to appeals taken to the superior court, and having in mind our former decisions relative to statutes of this nature, we are constrained to hold that the *administrative determination of the facts is conclusive on the court* unless it be *wholly without evidential support or wholly dependent upon a question of law,* or *clearly arbitrary or capricious.* It seems certain that the court which tries the case sits as a court of equity with limited powers. The court shall review the issues of law which have been previously raised. The court shall review the power of the commissioner to act. The court *shall review the facts only in so far as it is necessary to determine whether the commissioner has acted arbitrarily or capriciously,* and whether he applied properly the law to those facts.

"By virtue of the portion of the act which makes the decision of the director *prima facie* correct and imposes upon the attacking party the burden of proof, *there is a presumption that the factual findings of the commissioner are not arbitrary or capricious.* This presumption cannot be overcome by showing that there was evidence presented from which an opposite conclusion might have been drawn. It must be shown that there was no room for a difference of opinion and that there was no substantial evidence upon which the finding of the commissioner could have been based." (Italics ours.)

In the case cited, we referred to the case of *Sweitzer v. Industrial Ins. Commission,* 116 Wash. 398, 199 Pac. 724, wherein we had this to say relative to "arbitrary and capricious action":

"These terms, when used in this connection, must mean wilful and unreasoning action, action without consideration and in disregard of the facts and circumstances of the case. Action is not arbitrary or capricious *when exercised honestly and upon due consideration* where there is room for two opinions, *however much it may be believed that an erroneous conclusion was reached."* (Italics ours.)

Respondents stress the fact that there was no labor dispute between the mill owners and respondents existing at any of these plants, but that any labor dispute, which may have existed and because of which the mills were unable to obtain logs, was between the loggers and the mills, and

the fact that the loggers and respondents belonged to the same union did not in itself disqualify respondents from securing benefits.

■ It will be noticed that the statute, § 9998-105 (e), *supra*, does not say that the labor dispute must be between claimants for benefits under the act and their employers, but it states that "for any week with respect to which the *commissioner finds* that his total or partial unemployment is due to a stoppage of work which exists *because of a labor dispute at the factory*," etc., a claimant shall be disqualified.

It is apparent that, under the above subsection, any employee of any factory, mill, etc., is disqualified from receiving benefits, where the commissioner finds, and his finding is supported by substantial evidence, that the employee's total or partial unemployment is due to a stoppage of work because of a labor dispute at the factory, mill, etc., regardless of the principals to that dispute, unless such employee *shows to the satisfaction of the commissioner* that he was not participating in, financing, or directly interested in such labor dispute, *and* that he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed on the premises at which the stoppage occurs, any of whom are participating in, or financing, or directly interested in the dispute. See *In re St. Paul & Tacoma Lbr. Co., supra.*

It should be noted here that nowhere in the act is the term "labor dispute" defined. We are of the opinion that the legislature deliberately failed to define that term, for the reason that it realized that any attempt to define that term might result in a definition which would not meet conditions arising in the future. The legislature therefore left this question to be determined by the commissioner.

In regard to the question of the meaning of the term "labor dispute," the court in the case of *Johnson v. Pratt,* 200 S. C. 315, 20 S. E. (2d) 865, had this to say:

"It is not the province of this court, under this proceeding, to look beyond the evidence in this particular case and to venture into fields of speculation as to what might occur

under states of fact which are not in evidence. Nor does this court believe that it is incumbent upon it, in this case, to prepare and adopt definitions of such phrases as 'labor dispute' and 'grade or class' which the legislature has not defined.

"The language of section 5 (d) enumerates certain workers who shall not be eligible for benefits 'for any week with respect to which the commission finds' that certain conditions exist, and provided that this part of the act shall not apply if certain conditions are 'shown to the satisfaction of the commission.' In our opinion, therefore, the determination of these conditions was intended by the legislature to be for the commission to decide, upon the evidence, insofar as conditions of fact are concerned."

It may be here stated that in the cited case the court was construing a statute almost identical with subsection (e) of Rem. Rev. Stat. (Sup.), § 9998-105, *supra*. The court continued:

"We are of the opinion that the commission correctly recognized that section 5 (d) (1) and section 5 (d) (2) establish separate conditions, both of which a claimant must satisfy. Section 5 (d) must be read to give effect to both conditions. Section 5 (d) (2) cannot be so construed as to render the grade or class provision to have been satisfied by compliance with the terms of the preceding subsection, for in that event section 5 (d) (2) would be devoid of meaning."

The above citation indicates clearly, and we think correctly, the burden which is cast upon a claimant.

In many cases, as a result of a labor dispute existing at a plant, a strike is declared or there is a lockout, but it is not necessary that there be a strike or lockout at a plant before there can be a labor dispute which may cause a stoppage of work.

Having in mind what has been hereinbefore stated we now come to the question of whether or not there was substantial evidence to sustain the decision of the commissioner that the stoppage of work at the mills here involved was caused by a labor dispute existing at the several establishments.

It does not seem to us there can be any question but that the commissioner was justified by the evidence in finding that the stoppage of work at all three mills was directly caused by a labor dispute between Local 3-2, the sole collective bargaining agent for respondents, and the mill owners, such labor dispute arising because of the action of the union, on the one hand, in declaring the stored logs unfair and that if any attempt was made by the mills to work on them the entire operations would be declared unfair, and in placing pickets on the logs, and the contention of the mill owners, on the other hand, that the logs were not unfair.

The refusal of the tug boat companies to haul the logs to the mill, and the failure of the mills to have logs to cut, were only incidental to, and resulted from and because of, the action of the union and the resulting labor dispute.

The commissioner was justified in finding and concluding that all the mills had an ample supply of logs in storage to have enabled them to continue normal operations during the period of the shut down; that they were willing to continue operations; but that it would have been useless for them to bring in the stored logs, even if it could have been done, as the mill men would not have worked on them, and such action on the part of the mills would have resulted only in having their entire operations declared unfair.

While it may be admitted that the affirmative showing in regard to the contention of the management in the Miller case is not as strong as in the other two cases, still we think there was substantial testimony to justify the commissioner in finding that the stoppage of work was caused by a labor dispute at that plant.

Having concluded that the stoppage of work was caused by a labor dispute between Local 3-2 and the mill owners, was the commissioner justified in finding that, inasmuch as Local 3-2 was the sole collective bargaining agent for respondents under the law and the facts in the case, the union was in fact respondents' agent, and that its acts

and contentions in regard to the stored logs were in fact the acts and contentions of respondents, and therefore the labor dispute was in fact the labor dispute of respondents?

It is admitted that all of respondents belong to Local 3-2. It is also admitted that Local 3-2 is the sole collective bargaining agent for respondents. The agreement entered into between Local 3-2 and each of the mills here involved, on or about May 19, 1941, provided in part that it was entered into for the purpose of securing for the employees and the local union membership the full benefits which might be derived from orderly and collective bargaining in dealing with wages, hours of employment, working conditions, and operating efficiency. It also provided that the employer agreed to recognize Local 3-2 as the sole collective bargaining agent for all employees.

Federal Code Annotated, vol. 9, title 29, § 159 (29 U. S. C. A. § 159), provides in part as follows:

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, *or other conditions of employment:* Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer." (Italics ours.)

In construing the section last above referred to, the court, in *North Electric Mfg. Co. v. National Labor Relations Board,* 123 F. (2d) 887, stated:

"Title 29, U. S. C., § 159(a), 29 U. S. C. A. § 159(a), provides that representatives selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purpose, 'shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining' in respect to conditions of employment. *The union, then, is agent and attorney for the employees in the appropriate unit after it has been designated as bargaining agent.*" (Italics ours.)

Many more cases might be cited to sustain the above italicized statement, but the rule seems to have been so

universally established as to need no further citations to sustain it.

While it is true that the Federal act above referred to does not prevent any employee or group of employees from at any time presenting grievances to their employer, nevertheless there are limitations placed upon the rights of employees, where they would tend to override provisions of the contract between the employer and such exclusive bargaining agent. See *National Labor Relations Board v. Grower-Shipper Vegetable Ass'n,* 122 F. (2d) 368; *Bloedel Donovan Lbr. Mills v. International Woodworkers,* 4 Wn. (2d) 62, 102 P. (2d) 270.

However, the provision of the act last referred to is not involved herein, as it does not appear that any of respondents at any time ever expressed dissatisfaction with the action taken by Local 3-2, nor did any of them at any time indicate that they would work on the logs declared unfair by the union if they were brought to the mill. We are of the opinion that the mills were justified in believing that Local 3-2, the designated bargaining agent of respondents, was, in sending out the notices, acting for and on behalf of respondents, inasmuch as there was nothing in the notice to indicate otherwise. The notice was signed by Art Anderson, recording secretary, who, together with the president of Local 3-2, signed, for the local, the agreements with the mills.

It is true that Local 3-2 was also the bargaining agent for the loggers, but it will be remembered that the logs in question had been cut, rafted, and stored prior to the time the loggers' strike was called on May 9th. What, then, would be more logical to assume than that Local 3-2, acting on behalf of and as the agent of respondents, in order to assist the striking loggers, had declared the stored logs to be unfair and could not be cut.

Prior to the receipt of the notice of May 22nd, the mills had never dealt with Local 3-2 as representing the loggers; its dealings with this union had always been, in so far as

the record shows, in connection with the interests of its mill workers.

It seems to us that to hold, under facts such as here presented, that the burden was cast upon the employer to determine whether the union was in fact acting for the loggers or for respondents, in sending out the notice of May 22nd, would be placing upon the employer a burden not intended by the law. Local 3-2 being the lawfully designated agent of respondents, the employers, having dealt with it as such, were, under the facts in this case, justified in believing that Local 3-2 was acting for respondents, and that no purpose would be served by bringing the stored logs to the mills, even if that could have been done, as the mill men would not work on them, the union having declared them unfair.

Respondents cite and rely to a considerable extent on the case of *Wicklund v. Commissioner of Unemployment Compensation,* 18 Wn. (2d) 206, 138 P. (2d) 876, arguing that the cited case, or perhaps more correctly speaking the two cases there involved, are substantially identical with the case now before us, particularly relying on the following statement found on p. 223 of that opinion:

"It is clear from the record that the railroad department in which respondent trainmen were employed was a separate branch of work which is commonly conducted as a separate business in separate premises and thus to be deemed a separate establishment, as the commissioner found the boommen to be. The railroad department was a separate department in which there was no labor dispute. The 'sit-down' strike was in the woods at the end of the line, and was initiated and furthered by members of Local 3-2 solely. With the highly skilled craft of operating the trains the loggers had nothing whatsoever to do. On the other hand, the trainmen had no part in the work of logging, which we may concede is also a skilled operation. While a man might become skilled as a trainman and also as a logger, he would work either at one craft or the other but never as a trainman and as a logger simultaneously. The work of the logger is in one department and the operation of the trains is another department of the employer's business. The trial court correctly decided that respondents were

entitled, under the undisputed facts, to unemployment compensation."

We think it apparent that the decision in the case last cited is based upon facts so different from the facts in the cases now before us as to make it inapplicable herein. We quote further from the *Wicklund* case, p. 212:

"Concededly, there was a stoppage of work which existed because of a labor dispute (strike called by members of one union because members of another union working for the same employer would not become members of the striking union) initiated by members of Local 3-2, and the only question presented by the findings of appellant commissioner is whether respondents were 'directly interested' in that labor dispute, within contemplation of the statute (Rem. Rev. Stat. (Sup.), § 9998-105(e)). . . .

"There is no language in the unemployment compensation act which even infers that the legislature contemplated requiring, as a condition precedent to the right to work, or as a condition prerequisite to the right to unemployment compensation, that the claimant for benefits be a member of any union, refrain from joining any labor organization, or resign from or transfer his allegiance from one labor organization to another labor organization."

Also, on p. 210:

"Respondent trainmen were not members of Local 3-2, but were members of union groups designated as the railway brotherhoods."

Respondent trainmen refused to become members of Local 3-2, and as a result the members of that local refused to load logs on cars handled by the trainmen. The opinion continues:

"The trainmen were at all times willing and anxious to continue working under conditions existing at the time Local 3-2 called the strike. They reported for work as long as work was available, but it was impossible under the conditions obtaining—refusal of members of Local 3-2 to load logs on cars handled by respondents so long as they failed to comply with demand to join Local 3-2; hence, log production was suspended and respondents were unemployed."

The court made the following statement, p. 215:

"It is clear from an examination of the statute (29 U. S. C. A. § 159) *that such bargaining agency is not an agent for such employees as do not choose to become a part of it.*" (Italics ours.)

The above statement was of course made in view of the facts in the cited case and the law applicable thereto, and is explained by the following statement:

"The statute does not contemplate the creation of an involuntary agency for a workman who refuses to become a member of such union agency, or who refuses to join any union. That statute does not, nor does any other valid statute of which we are aware, require, as a condition precedent to the right to work or the right to unemployment compensation, that one become, or refrain from becoming, a member of any union, or change affiliation from one labor union to another labor union."

We are clear that it was not the intention of the court, in making the above italicized statement, to hold that a union legally designated by the majority of the members of any unit as the sole collective bargaining agent, is not in fact their agent, whose acts are the acts of such members, at least so long as such union deals with the employer relative to rates of pay, wages, hours of employment, or other working conditions.

We are satisfied that, both on the facts and the law, the decision of the commissioner in each of the cases now before us may be sustained upon the theory that respondents were directly interested in the labor dispute, made so by the acts of their designated bargaining agent, and because thereof they became disqualified for receiving benefits under the act.

It may be noted here that, while the decision of the commissioner in the Miller case was based upon findings to the effect that claimants had failed to show to his satisfaction that they were not participating in or directly interested in the labor dispute which caused the stoppage of work, our conclusion that all the respondents were directly interested in the labor dispute which caused the stoppage of

work, requires that the decision of the commissioner be affirmed, for it must follow that, if respondents were directly interested in the labor dispute, the commissioner was not arbitrary or capricious in finding that they had not shown to his satisfaction that they were not participating in or directly interested in such dispute.

The judgment of the trial court in each of these cases is reversed and remanded, with instruction to enter judgment in each case confirming the action of the commissioner.

SIMPSON, C. J., STEINERT, GRADY, and MALLERY, JJ., concur.

