BURRELL *v.* FORD MOTOR COMPANY

Opinion of the Court

1. Words and Phrases—Participation.

"Participation" means to take part in, to receive or have a part or share of or to be engaged in an activity.

2. Unemployment Compensation—Labor Disputes—Union Dues—Strike Fund.

Michigan Employment Security Commission Appeal Board properly held that claimants did not finance a labor dispute where the union provided monetary support to unemployed claimants and to union members on strike from its strike assistance fund and the union's constitution required "two distinctly separate monthly dues payments to the International" as, any differentiation between administrative dues and Strike Insurance Fund dues was merely an internal designation by the union and the facts clearly show that the union did not increase the amount of its dues nor redesignate any portion thereof after the inception of the labor dispute (CL 1948, § 421.29[b] [II], as amended by PA 1963, No 226).

3. Unemployment Compensation—Labor Disputes—Terms of Employment—Conditions of Employment.

No basis is found in the record, on claims by employees for unemployment compensation, for holding that there was a practice or custom or contractual obligation to extend within a reasonable period to claimants terms and conditions of employment substantially similar or related to some or all of the changes in terms and conditions of employment made for the workers among whom there existed the labor dispute which caused the claimants' unemployment where there was undis-

---

References for Points in Headnotes

[1-6] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 36.

Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes.  28 ALR2d 287.

puted testimony that the employer did not have a policy of extending every agreement it made in one plant of the employer to another.

4. UNEMPLOYMENT COMPENSATION—LABOR DISPUTES—TERMS OF EMPLOYMENT—CONDITIONS OF EMPLOYMENT.

No cause for disqualification of claimants for unemployment compensation benefits is found on the question of a change in the terms and conditions of employment where it was not shown that the purpose of local labor disputes was to change the working conditions of claimants.

5. UNEMPLOYMENT COMPENSATION—COLLECTIVE BARGAINING AGREEMENTS—EVIDENCE.

A "reasonable expectation" of an effect on unemployment compensation claimants' wages, hours or other conditions of employment must be deemed to have existed in the absence of any evidence to the contrary where Collective Bargaining Agreements, both national and local, pertaining to claimants had "expired," they had "been opened by mutual consent," and their terms could have been "modified, supplemented or replaced" (even though they were not) until such time as the newly negotiated agreements became fully effective by formal execution.

OPINION CONCURRING IN AFFIRMANCE
BLACK, J.

6. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION—LABOR DISPUTES.

*Employees were disqualified for unemployment compensation benefits where there was competent, material, and substantial evidence to support the findings by the Michigan Employment Security Commission Appeal Board that they were both "directly involved" and "directly interested" in the labor disputes which caused their unemployment; it is not disputed that the strikes which caused their unemployment occurred when the master collective bargaining agreement between their employer and the international union had been opened by mutual consent and was being renegotiated; and there was no evidence in the record to indicate that plaintiffs' wages, hours, or other working conditions would not be affected by the resolution of the labor disputes involved in those renegotiations (CL 1948, § 421.29[b], as amended by PA 1963, No 226).*

Appeal from Court of Appeals, Division 2, Lesin-
ski, C. J., and Quinn and O'Hara, JJ., affirming
Ingham, Sam Street Hughes, J.  Submitted Novem-
ber 4, 1971.  (No. 31 October Term 1971, Docket
No. 52,949.)  Decided December 21, 1971.

24 Mich App 651 affirmed.

Claims by Bartholomew Burrell and other em-
ployees of the Ford Motor Company for unemploy-
ment compensation.  Benefits denied.  Plaintiffs
appealed to circuit court.  Affirmed.  Plaintiffs ap-
pealed to the Court of Appeals.  Affirmed.  Plain-
tiffs appeal.  Affirmed.

*Zwerdling, Miller, Klimist & Maurer,* for plain-
tiffs.

*Wright Tisdale, Joseph A. O'Reilly,* and *Richard
A. Fellrath,* for defendant.

ADAMS, J.

## I. FACTS AND PROCEEDINGS

The issue to be decided in these cases is whether
the plaintiffs are entitled to unemployment com-
pensation under the Michigan Employment Security
Act (MCLA § 421.1 *et seq.*; Stat Ann 1968 Rev §
17.501 *et seq.*).  During November 1964, 11,196 work-
ers employed at 9 Michigan Ford plants (Mon-
roe, Owosso, Highland Park, Wixom, Utica, Livonia,
Rawsonville, Brooklyn and the River Rouge area)
filed claims for unemployment insurance benefits.
During that month strikes which had caused the
plaintiffs' unemployment had been called at the
following nine Ford plants: Dallas, Texas, Assem-
bly Plant; Sheffield, Alabama, Engine and Foundry

Division; Louisville, Kentucky, Assembly Plant; Buffalo, New York, Stamping Plant; Sterling, Michigan, Plant; Wayne, Michigan, Assembly Plant; Michigan Truck Plant; Ypsilanti, Michigan, Plant; and Chicago, Illinois, Stamping Plant.

The labor disputes in these plants arose as a result of the reopening of National Agreements between the Ford Motor Company and the UAW. These agreements included the Collective Bargaining Agreement, the Retirement Plan, the Supplemental Unemployment Benefit Plan, and the Skilled Trades Supplemental Agreement. In a June 1, 1964 UAW reopening notice to the Ford Motor Company, the UAW stated that the local agreements were also subject to "termination, modification or amendment."

Negotiations between the Ford Motor Company and the UAW commenced July 1, 1964. The cutoff date for submission of demands by the local unions was set at August 7, 1964. Mr. Cummins, Director of Ford Motor Company's Labor Affairs Office, stated: "In other words, when we arrived at that date, the local unions' position had to be frozen, as well as the company's."

On September 18, 1964, an agreement on economic aspects was reached in principle between the company and the union conditioned on, and subject to, resolution of all unsettled local issues. The language of the new National Collective Bargaining Agreement and the Supplemental National Agreements was not changed after early October 1964, with the exception of the provisions of the Skilled Trades Supplemental Agreement which were not in issue in any of the disputes that caused claimants' unemployment.

During the month of October 1964, the local unions (other than the nine which struck) ratified their

local agreements and voted on the National Agreements. November 6, 1964, was established as the strike deadline for unresolved local issues. On that date, upon authorization of the National UAW, the nine plants aforementioned were struck. The last strike terminated by November 23, 1964. This became the effective date of both the National and local agreements.

As a result of the strikes, there was curtailment of production in other Ford plants causing the claimants to be laid off. During their unemployment, the UAW gave the claimants monetary assistance from the strike fund subject to repayment once they received unemployment compensation.

The claimants then applied for unemployment benefits. The claims interviewer initially and upon redetermination found them eligible for benefits. The referee, in reversing the redetermination, held that the claimants were "directly involved" in the labor disputes which caused their unemployment by "participating," "financing," and being "directly interested" in such disputes and thus were ineligible for benefits. The Appeal Board affirmed the referee. On appeal to the Circuit Court, Judge Sam Street Hughes affirmed the referee and the Appeal Board. On further appeal, the Court of Appeals affirmed the circuit court, stating:

"[P]laintiffs were 'directly interested' in resolution of the labor disputes which prevented formal execution and adoption of the master collective bargaining agreement which did affect their wages, hours, or working conditions." 24 Mich App 651, 655.

We granted leave to appeal. (384 Mich 792.)

## II. THE STATUTE

These cases arise under the Michigan Employment Security Act in effect in 1964 (MCLA § 421.1 *et seq.* [Stat Ann 1968 Rev § 17.501 *et seq.*]). The pertinent portions of § 29 are :[1]

"(1) An individual shall be disqualified for benefits:

\* \* \*

"(b) For any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by such labor dispute, in the establishment in which he is or was last employed, or to a labor dispute (other than a lockout) in active progress, or to shutdown or start-up operations caused by such labor dispute, in any other establishment within the United States which is functionally integrated with such establishment and is operated by the same employing unit. No individual shall be disqualified under this paragraph (b) if he is not directly involved in such dispute. For the purposes of this paragraph (b), no individual shall be deemed to be directly involved in a labor dispute unless it is established that:

\* \* \*

"II. He is participating in or financing or directly interested in the labor dispute which causes his total or partial unemployment. The payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be construed as financing a labor dispute within the meaning of this paragraph (b), or

\* \* \*

"The term 'directly interested' as used in this paragraph (b) shall be construed and applied so as not to disqualify individuals unemployed as a result of

---

[1] Section 29, as found in PA 1963, No 226, which was in effect when this dispute arose in 1964. As amended as to form only by PA 1965, No 281, this is now § 29(8). (MCLA § 421.29(8) [Stat Ann 1971 Cum Supp § 17.531(8)].)

a labor dispute the resolution of which may not reasonably be expected to affect their wages, hours or other conditions of employment, and to disqualify individuals whose wages, hours or other conditions of employment may reasonably be expected to be affected by the resolution of such labor dispute. A 'reasonable expectation' of an effect on an individual's wages, hours or other conditions of employment shall be deemed to exist, in the absence of substantial and preponderating evidence to the contrary: (I) if it is established that there is in the particular establishment or employing unit a practice or custom or contractual obligation to extend within a reasonable period to members of the individual's grade or class of workers in the establishment in which the individual is or was last employed changes in terms and conditions of employment which are substantially similar or related to some or all of the changes in terms and conditions of employment which are made for the workers among whom there exists the labor dispute which has caused the individual's total or partial unemployment; or (II) if it is established that one of the issues in or purposes of such labor dispute is to obtain a change in the terms and conditions of employment for members of the individual's grade or class of workers in the establishment in which the individual is or was last employed; or (III) if such labor dispute exists at a time when the collective bargaining agreement (which covers the individual's grade or class of workers in the establishment in which the individual is or was last employed and the workers in another establishment of the same employing unit who are actively participating in such labor dispute) has expired, has been opened by mutual consent or may by its terms be modified, supplemented or replaced."

### III. Issues

The parties had stipulated in the hearing before the referee that the Ford establishments were "func-

tionally integrated". Consequently, there is no separate establishment issue in this case.[2] The main issue is whether the claimants are disqualified because they are within the "directly involved" standard due to participating in, financing, or being directly interested in the labor disputes which caused their unemployment.

## A. Did Claimants Participate in the Labor Disputes?

"Participating * * * in the labor dispute" is not defined in the statute. The claim of participation is based on the UAW being the exclusive bargaining agent for the struck workers and the claimants. Appellees state the issue as follows:

"The Claimants, through the Union, had agreed with the Company that the proposed changes affecting the Claimants and the other members covered by the agreement would not be effective unless and until all unresolved local issues also were settled. In these circumstances, the Claimants continued to participate as interested principals, through their common agent, the International Union, in the labor disputes that remained in active progress until after the strikes which their agent, the International Union, had authorized were settled and the new agreements became effective on November 23, 1964."

Plaintiffs counter that all local issues had been frozen on August 7, 1964; that during September and October, the local issues in their plants had been resolved; and that the National Agreements affecting them had also been resolved in principle. Therefore, they argue that there could be no basis for finding participation by them in the strikes in other plants during November even if their common agent,

[2] See *Park* v. *Employment Security Commission* (1959), 355 Mich 103, decided prior to the 1963 amendments to the statute.

the National UAW, was still assisting in the resolution of local issues in these struck plants.

"Participation" means to take part in, to receive or have a part or share of or to be engaged in an activity. As to plaintiffs, all issues, local or national, had been agreed to. Any local demands won at the struck plants would not be implemented at the claimants' plants. We find no basis for disqualification on the ground of participation.

### B. Did Claimants Finance the Labor Disputes?

"Financing" is based, first, on the UAW's monetary support to these unemployed claimants and to the union members on strike from the strike assistance fund, and second, on the union constitution's requirement of "two distinctly separate monthly dues payments to the International".

According to the statute: "The payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be construed as financing a labor dispute within the meaning of this paragraph."

The referee found that since the strike fund had its own regular monthly dues, it was outside the "regular union dues" of the statute.

The Appeal Board correctly disposed of this issue favorably to the claimants as follows:

"In his decision, the learned Referee concludes that one of the reasons for the claimants' disqualification is that the payment of their Union dues was deemed to have met the requirement of financing within the meaning of Subsection II. We point to our position clearly expressed in the cases of *In the Matter of the Claim of Eleanor Apperley, et al.,* Appeal Docket No. B64–3775(3) et al.—33728; *In the Matter of the Claim of Frank Wolak, et al.,* Appeal Docket No. B64–3733(2) et al.—33729; and *In the Matter of the Claim of Donald L. Ward, et al.,*

Appeal Docket No. B64–3799(1) et al.—33726, to indicate our position on this matter. In the *Wolak* case, the Board stated at page 15, 'It is, therefore, apparent that under Subsection II of Section 29 (1)(b) of the Act as amended September 6, 1963, the claimants did not finance the labor dispute because of the payment of their regular Union dues which was in an amount and for purposes established prior to the inception of such labor dispute. We believe that any differentiation between administrative dues and Strike Insurance Fund dues is merely an internal designation by the Union and still establishes that the regular Union dues are established to be $5 monthly under Article 16, Section 2, . . .' The facts in the instant matter clearly show that the Union did not increase the amount of its dues nor re-designate any portion thereof after the inception of the labor dispute on June 1, 1964. It is, therefore, our holding that the claimants did not finance this labor dispute under the provisions of Subsection II of Section 29(1)(b) of the Act."

## C. *Were These Claimants "Directly Interested" in the Labor Dispute or Labor Disputes?*

1. Was there a practice or custom or contractual obligation to extend within a reasonable period to claimants terms and conditions of employment substantially similar or related to some or all of the changes in terms and conditions of employment made for the workers among whom there existed the labor dispute which cause the claimants' unemployment?

Ford offered evidence that demands in one plant which were company-wide in scope serve as a basis for other plants to make similar demands during subsequent collective bargaining. Nevertheless, Malcolm L. Denise, Vice President (Labor Relations, Ford Motor Company) stated:

"The position that our vast collection of local agreements and practices simply cannot be placed on the cafeteria counter to be picked and chosen indiscriminately at the whim of all comers has been consistently maintained over the years, and must continue to be."

Mr. Cummins, Director of the Ford Motor Company Labor Affairs Office, stated:

"We do not have a policy of automatically extending every agreement we make in one plant to another, even though we are pressured extremely hard to do it."

In view of the above quoted and undisputed testimony, we do not find in this record a basis for holding that it was "a practice or custom or contractual obligation to extend within a reasonable period * * * terms and conditions of employment which are * * * made for the workers among whom there exists the labor dispute" to these claimants.

2. Was it established that one of the issues in or purposes of such labor dispute was to obtain a change in the terms and conditions of employment for members of the individual's grade or class of workers in the establishment in which the individual is or was last employed?

The referee and the Appeal Board defined "labor dispute" as including the National Agreements which, during the time of the local strikes, were not formally signed and in effect.

In the "directly involved" clause (§ 29[b]),[3] "such dispute" clearly referred to the dispute which is the cause of unemployment. In this case, it was not the labor dispute over the National Agreements that caused claimants' unemployment. The curtailment

---

[3] Currently found in MCLA § 421.29(8) (Stat Ann 1971 Cum Supp § 17.531[8]).

of production as a result of the *local* labor disputes caused the unemployment. It was not shown that the purpose of the local labor disputes was to change the working conditions of these claimants. We find no cause for disqualification on this question.

3. Did the labor dispute exist at a time when the collective bargaining agreement covering claimants had expired, been opened by mutual consent, or could, by its terms be modified, supplemented or replaced?

In this case, National Agreements were opened by mutual consent as of July 1, 1964. Local agreements were also opened. The final signing by which all agreements became effective was November 23, 1964, and this occurred *after* the settlement of the nine labor disputes.

Claimants point out, however, that the language of the new National Collective Bargaining Agreement and the Supplemental National Agreements was not changed after early October 1964, with the one exception already noted as to the Skilled Trades Supplemental Agreement.

Mr. Cummins testified that the paper written on September 18, 1964, "represents the National Contract." He explained that: "There were many provisions set forth in this Agreement that had to be reduced to contract language and approved and initialed by the parties, and some of this took place after September 18." However, Mr. Cummins went on to state: "I considered the national issues laid to rest. We were awaiting the settlement of the local issues before we formally signed—."

Claimants' position is that the negotiations consisted of a series of step-by-step agreements leading up to the formal contract signing. They cite a statement in the 1964 Annual Report of the Ford Motor Company that a number of *local* strikes

affected sales and earnings and point to articles in the *Wall Street Journal* quoting Ford officials to the effect that the National Agreement and most local agreements were resolved and only *local* strikes and issues in the struck plants remained open.

The difficulty with this analysis is that it is an after-the-fact one that does not take into account what could have happened if there had been no majority vote by union members ratifying the National Agreements, or if the issues at the struck plants had continued to go unresolved.

The Collective Bargaining Agreements, both national and local, pertaining to claimants had "expired," they had "been opened by mutual consent," and their terms could have been "modified, supplemented or replaced" (even though they were not) until such time as the newly negotiated agreements became fully effective by formal execution. In the words of the statute, a "reasonable expectation" of an effect on the claimants' wages, hours or other conditions of employment must be deemed to have existed in the absence of any evidence to the contrary.

The Court of Appeals is affirmed. Costs to the appellees.

T. M. Kavanagh, C. J., and T. E. Brennan, T. G. Kavanagh, Swainson, and Williams, JJ., concurred with Adams, J.

Black, J. (*concurring in affirmance*). I prefer to join in affirmance solely upon strength of the specific holding of Division 2 (24 Mich App 651) that the plaintiffs were both "directly involved" and "directly interested" in the disputes forming the instant subject matter. The reasoning of Judge Quinn for the Division, which I adopt, appears on pages 654, 656 of the cited report.