385 P.2d 239

**Donald M. BROBSTON et al., Appellants,**

**v.**

**EMPLOYMENT SECURITY COMMISSION of Arizona, and Kennecott Copper Corporation, Ray Mines Division, Ray and Hayden, Arizona, Appellees.**

**No. 7628.**

Supreme Court of Arizona.

En Banc.

Sept. 19, 1963.

Champe Raftery, Phoenix, and Frederick S. Smith, Superior, for appellants.

Robert W. Pickrell, Atty. Gen., Richard J. Daniels, Asst. Atty. Gen., for appellee Employment Security Commission.

Fennemore, Craig, Allen & McClennen, Phoenix, for appellee Kennecott Copper Corp.

STRUCKMEYER, Justice.

Appellants are members of either Crawford Lodge #942, Brotherhood of Locomotive Firemen and Enginemen, or Local #314, International Brotherhood of Electrical Workers, at Ray, Arizona. In this consolidated appeal they seek to review two judgments of the superior court affirming decisions of the Unemployment Commission of Arizona denying unemployment compensation.

The record discloses that appellee, Kennecott Copper Corporation, owns and operates establishments for the mining and reduction of copper ores in Arizona and various other states of the United States. Prior to June 30, 1959, appellee, through its Ray Mines Division, had entered into collective bargaining agreements with Local #314 and Lodge #942. On June 30, the agreements expired as did agreements with certain other unions, notably the International Union of Mine, Mill and Smelter Workers and the United Steelworkers of America. Although the collective bargaining agreements had expired, operations at the mine and smelter continued while representatives of appellee company and the two latter unions conducted meetings in Salt Lake City, Utah, in an effort to negotiate new agreements. Local #314 and Lodge #942 undertook to negotiate locally at Ray concerning what is described as conditions of employment as distinguished from matters affecting health and welfare. Prior to June 30, an understanding was reached affecting only conditions of employment.

Appellant Brobston, General Chairman of Local # 314, by letter of April 28, 1959, wrote to appellee:

"Negotiations now being held at Salt Lake City, Utah shall become part of our agreement for 1959, concerning Health and Welfare, Group Insurance, and Accident and Sickness Policies."

The evidence is susceptible of the conclusion that Lodge #942 would also have

acquiesced in such health and welfare benefits as might be worked out by the company and the International Union of Mine, Mill and Smelter Workers and the United Steelworkers in the negotiations at Salt Lake City. It is uncontradicted that the company's policy on health and welfare was to treat all employees alike. Cary E. Brace, President and Business Manager of Lodge #942, testified at a hearing before the Unemployment Security Commission on November 12, 1959:

"Q Did you infer, either in writing or in direct statements to anybody in the company that you would be willing to accept the health and welfare program that was agreed upon up in Salt Lake?

"A No, I did not, because that had been a practice. It has always been brought to us and we accepted it without any disagreement."

Other evidence justifies the conclusion that both local unions retained individually the right to reject the company's uniform application of conditions of health and welfare. Nevertheless, it is clear in light of the company's policy, that the decision arrived at in Salt Lake City would control the ultimate agreement.

On August 10, 1959, when no agreement had been reached in Salt Lake City, the Mine, Mill and Smelter Workers and United Steel workers commenced a strike to enforce their demands. The record does not disclose the reasons for the failure to reach an agreement—that is whether health and welfare were areas of disagreement—, but no agreement at that time had been reached on health and welfare. The company's operations at Ray, Arizona, were shut down and employees of non-striking unions in production were thrown out of work.

■ By Statute A.R.S. § 23-777, subd. A:

"An individual shall be disqualified for benefits for any week with respect to which the commission finds that his total or partial unemployment is due to a labor dispute, strike or lockout which exists at the factory, establishment or other premises at which he is or was last employed. This provision shall not apply if it is shown to the satisfaction of the commission that the individual is not participating in, financing or directly interested in the labor dispute, strike or lockout or that he does not belong to a grade or class of workers of which, immediately before the commencement of the labor dispute, strike or lockout, there were members employed at the premises at which the labor dispute, strike or lockout occurs, any of whom are participating in or financing or directly interested in the dispute, strike or lockout."

The Statute is designed to preserve the neutrality between an employer and his em-

ployees by withdrawing, irrespective of individual needs, benefits under the circumstances enumerated. Palpably, the intent of the legislature is that the state shall stand aside in order that a labor dispute may not be financed through unemployment compensation. Appellees' position is that appellants were disqualified from benefits as being "directly interested" in the strike at the company's establishment in Ray. It is urged that the controlling factor is whether the appellants' agreement could be affected, favorably or adversely, as a result of the strike called by other employees.

Supporting the appellees' position is the overwhelming weight of the decisions. For example, in Martineau v. Director of Division of Unemployment Security, 329 Mass. 44, 106 N.E.2d 420, where a foreman not a member of the striking union possibly stood to gain by the strike, the cause was reversed for determination of the issue of whether he would have. The Massachusetts Supreme Court said:

"* * * It is plain that the claimant's unemployment occurred in consequence of a labor dispute which brought about a stoppage of work. The claimant was not a member of the union which initiated the strike and he refrained from any activity in support of it, and the contrary is not contended. His position is, therefore, that he should not be deprived of benefits for a loss precipitated entirely by the efforts of others. That

there is force in this argument cannot be denied. The statute, however, does not confine disqualification to those employees who participate in or finance the labor dispute. In addition, it withholds benefits from employees who are 'directly interested in the labor dispute'. * * * Although the authorities are not uniform, the prevailing view is that a person is 'directly interested' in a dispute when his wages, hours, or conditions of work *will be affected favorably or adversely* by the outcome. It is of no consequence that the person is not a member of the union conducting the strike or that he may not be in sympathy with its purposes. * * *" 329 Mass. 49, 106 N.E.2d 424. (Emphasis supplied).

Conversely, in Outboard, Marine & Mfg. Co. v. Gordon, 403 Ill. 523, 87 N.E.2d 610, where a factory workers' union was on strike but no profits from the strike could accrue to the office workers' union and the office workers did not seek to share in any of the benefits which might accrue to the factory workers, it was held that the office workers were not directly interested in the labor dispute. The Illinois Supreme Court said:

"Appellant contends that its office employees were directly interested in the labor dispute and thus barred from eligibility for benefits. It must be conceded by the employer that no profit or

increase in pay would accrue to office workers by any result that could come from the strike. They did not seek to share in any of the benefits that might accrue to the other employees, if the latter should obtain some by strike action. While the office workers' union was to pay part of their dues to the other union, there was no reciprocal payment of any kind provided for. The office employees had concluded their bargain with the management and had nothing further to gain. They were asking for nothing. No one had asked them to share in the labor dispute and they had not sought or volunteered to do so. We therefore are forced to conclude from our examination of the record that there is no substantial evidence that the claimants were directly interested in the labor dispute." 403 Ill. 537, 87 N.E.2d 617.

The following cases construing statutes similar to ours constitute the almost unanimous weight of authority: Burak v. American Smelting & Refining Co., 134 Colo. 255, 302 P.2d 182; Lanyon v. Adm. of Unemployment Comp., 139 Conn. 20, 89 A.2d 558; Huiet v. Boyd, 64 Ga.App. 564, 13 S.E.2d 863; Kemiel v. Review Board, Indiana Employment Security Division, 117 Ind.App. 357, 72 N.E.2d 238; Local No. 658, Boot & Shoe Workers v. Brown Shoe Co., 403 Ill. 484, 87 N.E.2d 625; Martineau v. Director of Unemployment Security, 329 Mass. 44,

106 N.E.2d 420, supra; Nobes v. Michigan Unemployment Compensation Commission, 313 Mich. 472, 21 N.W.2d 820; Borchmanson v. Carpenter, 166 Neb. 322, 89 N.W.2d 123; Lepper v. Unemployment Compensation Board, 188 Pa.Super. 158, 146 A.2d 337; Henzel v. Cameron, 228 Or. 452, 365 P.2d 498.

Appellants rely on two decisions. In the New Jersey case of Kieckhefer Container Co. v. Unemployment Compensation Commission of New Jersey, 125 N.J.L. 52, 13 A.2d 646, the words "directly interested" were construed as confining disqualification to those who were "participating" in the dispute. The construction adopted there was approved and ostensibly followed by the Supreme Court of Washington in the case of Wicklund v. Commissioners of Unemployment, 18 Wash.2d 206, 138 P.2d 876, 148 A.L.R. 1298.

The force of both decisions has been greatly limited by later decisions. In Wasyluk v. Mack Mfg. Corporation, 4 N.J.Super. 559, 68 A.2d 264, the New Jersey court, in first noting that the statutes relating to unemployment compensation in most of the states including New Jersey were adopted from the English Statute, 10–11 George V, Ch. 30, [1920] as amended 14–15 George V. Ch. 30, said:

" * * * Our attention has not been called to the opinion of any of the high British courts construing the English. .

statute, but the Court of Referees and the British Umpire, the highest administrative agencies, have ruled that an individual is directly interested in the trade dispute when his wages, hours, or conditions of work will be affected favorably or adversely by the outcome.

"The appellant relies heavily upon the cases of Kieckhefer Container Co. v. Unemployment Compensation Commission of New Jersey, its Board of Review and John Bowen, 125 N.J.L. 52, 13 A.2d 646, and Kieckhefer Container Co. v. Unemployment Compensation Commission of New Jersey, its Board of Review and Frederick R. Aurich, 125 N.J.L. 55, 13 A.2d 648. We think, however, these cases are readily distinguishable on the facts from the case at bar and are not controlling. Neither Bowen nor Aurich were members of any labor union. Bowen at best was a utility man and Aurich an odd jobs man. It may fairly be said that each was in a class by himself. The former Supreme Court found that neither participated in or contributed to the union or were directly interested in the dispute which caused the stoppage of work." 4 N.J. Super. 562, 563, 68 A.2d 265.

The distinction was adhered to in the later case of Gerber v. Board of Review, 36 N.J. Super. 322, 115 A.2d 575, affirmed 20 N.J. 561, 120 A.2d 436.

The Wicklund case was similarly limited in the subsequent Washington decision, Appeals by Employees of Polson Lumber and Shingle Mills, 19 Wash.2d 467, 143 P.2d 316, where after a lengthy consideration of Wicklund, judgments of the trial court allowing benefits to the claimants were reversed.

We note in passing that by equating "directly interested" with "participating" the phrase "directly interested" is rendered meaningless and thus inoperative, idle and nugatory.

█ This is not a situation where appellants agreed to accept the existing conditions pertaining to health and welfare *unless* the company later offered better conditions as a result of the negotiations in Salt Lake City. To the contrary, appellants' agreement with the company was dependent upon the outcome of the negotiations there being conducted. Appellants were directly interested in the strike at appellees' establishment in Ray because their contracts relating to conditions of health and welfare were dependent upon and could be affected favorably or adversely by the outcome of the negotiations at Salt Lake City.

Judgments affirmed.

BERNSTEIN, C. J., UDALL, V. C. J., and LOCKWOOD, J., concur.

JENNINGS, Justice (dissenting).

I dissent. Kennecott's collective bargaining agreements with each of the bargaining agents, Lodge 942 Brotherhood of Locomotive Firemen and Enginemen, Local 314 International Brotherhood of Electrical Workers, International Union of Mine, Mill and Smelter Workers and the United Steelworkers of America, consisted of two separate instruments—one covering wages and working conditions, and one covering health and welfare benefits. The former established differing wage rates and conditions of employment for each group of workers represented by the bargaining agent, whereas the latter established terms which were substantially the same for all employees.

Prior to the expiration of these contracts negotiations on wages and working conditions were conducted in Arizona on a local level by the Company and representatives of each union concerned. Negotiations on the health and welfare plan, however, were conducted at Salt Lake City, Utah by regional representatives of the Company and international representatives of the Steelworkers and Mine-Mill. Appellants were not represented at these bargaining sessions, but because it had been the policy of the Company to maintain a uniform plan of health and welfare benefits for all employees, and because the appellants were not dissatisfied with the existing provisions of the contract, it was understood that they would accept whatever came out of the Salt Lake City negotiations with respect thereto.

The Employment Security Commission ruled that A.R.S. § 23–777, subd. A disqualified appellants from receiving unemployment compensation during the strike which followed a breakdown in negotiations at Salt Lake City, because their unemployment resulted from a labor dispute in which they were "directly interested." The statute is patently remedial and should be liberally construed to effect its beneficent purpose, which is to allow compensation to those who are involuntarily unemployed through no fault of their own, A.R.S. § 23–601, and the disqualifying provisions should be narrowly construed. Reynolds Metals Co. v. Thorpe, 41 Ala.App. 331, 133 So.2d 709 (1961); Southwest Lumber Mills v. Employment Security Comm'n, 66 Ariz. 1, 182 P.2d 83 (1947).

Admittedly, a majority of American courts hold an employee to be directly interested in a labor dispute if his wages, hours or working conditions will be affected by the outcome of the labor dispute which has caused his unemployment. But the fallacy of this test lies in its failure to recognize that an employer may be motivated to confer some benefits solely by the practical economic requirement of maintaining parity in working conditions among all employees, in which event every employee would be affected to some extent by a change in working conditions. Thus, by

substituting "affected" for "directly interested" the majority equates direct interest with "mere" interest or even "indirect" interest, thereby effectively repealing all statutory exceptions to the labor dispute provision when working conditions are an issue. The purpose of the "directly interested" provision was to eliminate the possibility of the key man strike—a device consciously employed by a union to impede production by removing a handful of workmen from an integrated operation.[1] Without this safeguard all nonstriking union members thrown out of work by the ensuing shutdown would be entitled to compensation benefits although their interest in the strike was as great as that of the few strikers. Compensation in such cases would be tantamount to payment of strike benefits by the state in violation of its hypothetical neutrality in labor disputes. Although the same tactic might be used by a key union when bargaining is conducted by a joint trade council or similar organization, it is difficult to envision its applicability to bargaining conducted by unions with separate financial reserves when the gains achieved by one union will not automatically be applied to the others.

A minority of courts have reacted to the obviously unfair and unintended results of the majority rule by interpreting "directly interested" to mean the furtherance of a labor dispute by participation and activity therein. Kieckhefer Container Co. v. Unemployment Compensation Comm'n, 125 N. J.L. 52, 13 A.2d 646 (1940); Wicklund v. Commissioner, 18 Wash.2d 206, 138 P.2d 876 (1943). Whereas the statute expressly disqualifies individuals participating in labor disputes, the term "directly interested" must have some meaning other than participation. Huiet v. Boyd, 64 Ga.App. 564, 13 S.E.2d 863 (1941).

The purpose of the statute may be implemented and the evils of these alternative interpretations avoided, however, by limiting the application of the "directly interested" clause to individuals whose wages, hours or conditions of employment will be automatically ascertained by settlement of the dispute as distinguished from individuals whose wages, hours or conditions of employment may or will be reviewed and altered in the light of such settlement.[2] The distinction here suggested may be illustrated by two cases. In Shell Oil Co. v. Cummins, 7 Ill.2d 329, 131 N.E.2d 64 (1956), the employer was negotiating with twelve unions which represented its employees. Agreement was reached with ten unions but the remaining two struck, causing a shutdown

1. Unemployment Benefits, 49 Colum.L.Rev. 550 (1949); Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification; 17 U.Chi.L.Rev. 294; 329 (1950); Williams, The Labor Dispute Disquali-
fication—A Primer, 8 Vand.L.Rev. 338, 350 (1955).

2. 10 Ben.Ser. 10–11842 (Conn.R.1946); 17 U.Chi.L.Rev. 294 n. 164 (1950).

of operations. In order to get the employees back to work the company offered a wage increase for *all* employees. The court affirmed an award of unemployment benefits to the nonstriking union members, saying:

"In its reply brief the appellant admits 'that Shell's policy at the refinery has been not to make any substantial distinction in the wage rates paid to the various union crafts. In other words, a wage increase granted to one union would be granted to all.' On the other hand, there was no evidence, whatsoever, to show that the claimants either requested further wage negotiations or, absent the picket line, would have failed to honor the terms of their prior agreement had a wage increase not been forthcoming. From these facts, we feel it was reasonable to conclude that, as to the ten ratifying unions, any wage increase which they received was voluntarily tendered by the employer for the purpose of creating good will and of promoting harmonious employment relationships. By accepting this generosity, these claimants cannot be said to have become directly interested in the labor dispute." 7 Ill.2d at 336, 131 N.E.2d at 68.

In Dravo Corp. v. Unemployment Compensation Bd., 187 Pa.Super. 246, 144 A.2d 670 (1958), an employers' association, which was conducting joint negotiations with a trade-union council made up of representatives from four unions, reached an interim agreement with the carpenters' union. A new multiple employer, multiple union agreement was subsequently entered into, but only after a strike by one of the unions forced a shutdown of operations. The court denied compensation to the nonstriking carpenters on the ground that they were directly interested in the strike because the interim agreement was intended to be operative only until the new agreement, *which was negotiated on behalf of and for the benefit of the members of all unions,* should go into effect.

In the instant case the Company admits that each of the unions could have insisted that it have a particular health and welfare plan for its members even though other unions might have a different plan, and that each union could have attempted to enforce such demands by a strike. It is not disputed that appellants' unions were not represented at the negotiations in Salt Lake City and that the negotiations there did not bind them. Nor is it disputed that the Company, as a matter of policy, may extend to nonrepresented employees the same welfare program that was exacted from it by represented employees, or from time to time change that policy and refuse to so extend the plan to nonrepresented employees.

It is apparent from the foregoing that the details of the health and welfare plan which

were agreed upon at Salt Lake City would not automatically be extended to the non-represented unions' members. It would in fact require acceptance by these unions and agreement thereto by the Company. Therefore, appellants were not directly interested in the strike and are entitled to compensation.