AARON et al., Appellees,

v.

**OHIO BUREAU OF EMPLOYMENT SERVICES et al., Appellants.**

[Cite as *Aaron v. Ohio Bur. of Emp. Serv.* (1998), 130 Ohio App.3d 376.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 97 C.A. 61.

Decided Oct. 22, 1998.

*Frederick G..Cloppert, Jr.* and *William J. Steele,* for appellees.

*Betty D. Montgomery,* Attorney General, *Frank J. Reed, Jr.* and *Stefan J. Schmidt,* Assistant Attorneys General, for appellant Administrator, Ohio Bureau of Employment Services.

*John M. Kunst, Jr.* and *Robert J. Reid,* for appellant General Motors Corporation.

Cox, Judge.

This matter presents a timely appeal from a judgment rendered by the Mahoning County Common Pleas Court reversing the decision of appellant, Ohio Bureau of Employment Services Board of Review, denying appellees unemployment compensation benefits and ordering the board to remove appellees' disqualifications and direct the administrator to pay appellees' claims. There are over five thousand appellees, all of whom are employees of appellant, General Motors Corporation, and work at the assembly plant in either Lordstown, Ohio or Wentzville, Missouri.

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "International UAW") represents General Motors Corporation ("GM") employees in both local and national collective bargaining agreements ("CBA") with GM. These agreements govern union-represented employees at each plant. Local agreements are negotiated between a particular GM plant and a UAW local and address specific plant issues. National agreements are made between GM and the International UAW and govern general terms and conditions of employment for all UAW members.

As with the dual CBA structure, strikes may take two forms. First, the International UAW may call a strike of all UAW locals or selectively call strikes of certain UAW locals. Second, a UAW local may strike at a particular plant with the International UAW's approval.

In 1996, UAW Local 696 ("Local 696") was operating under both a national CBA, effective November 15, 1993 to September 1996 (the "National Agreement"), and a local CBA made in March 1994 (the "Local Agreement") with Delphi Chassis Systems, in Dayton, Ohio ("Delphi"). Despite these agreements, local issues concerning subcontracting, general grievances, manpower, health and safety, and sourcing remained disputed.

As GM's critical brake component facility, Delphi actively produces antilock braking systems ("ABS") for GM's automobiles. GM utilizes a "ball screw" mechanism on its ABS compared to the solenoid-based braking system ("SBS") used by other manufacturers such as Bosche. Although the ball screw mechanism was cost-effective and reliable in its early development stage, the SBS technologically surpassed it. This new technology concerned both Local 696 and GM. Unable to develop an SBS timely, union-represented employees at Delphi faced outsourcing, and, as a result job loss. Comparatively, GM feared that it would lose global market competitiveness without an SBS and contemplated ways to implement an SBS quickly so as to remain competitive with other auto manufacturers presently using the system. GM notified the International UAW that it intended to introduce Bosche's SBS, and that consequently, that use would require outsourcing.

The National Agreement contains a provision known as Appendix L, which covers product sourcing at GM's assembly plants. Sourcing refers to both insourcing and outsourcing of GM products. With insourcing, GM begins to manufacture products previously produced by a non-GM supplier. In contrast, outsourcing is a procedure whereby GM obtains a product from a non-GM provider that GM previously produced in-house. Sourcing issues have created tension between the International UAW and GM, particularly regarding GM's contractual commitments under Appendix L. The provision states in part:

"It is an objective of the Corporation to grow the business and to continue to rely upon its employees and facilities as the source of its products." Agreement between General Motors Corporation and the UAW, October 24, 1993 (Effective November 15, 1993).

Disagreement arose between GM and the International UAW as to what "grow the business" meant. GM interpreted "grow the business" as cost-effectiveness coupled with competitiveness so as to attract new business, whereas the International UAW interpreted it to mean simply more jobs. Additionally, GM and the International UAW disagreed on the right to strike over sourcing, and after much

debate, GM prevailed. The National Agreement provided that sourcing issues are subject to grievance and arbitration procedures and are not strikeable issues.

Unable to resolve disputed local issues on health and safety, general grievances, subcontracting, manpower, and particularly, sourcing, GM and Local 696 remained at odds. On September 17, 1995, Local 696 successfully obtained authorization from the International UAW to strike at Delphi. On March 5, 1996, Local 696 initiated a work stoppage at Delphi. The strike ended on March 21, 1996, and union-represented employees resumed work on March 22, 1996.

The Delphi strike affected not only Delphi but most of GM's North American operations. As a result of GM's functional integration system, all but three of GM's assembly plants were forced to close or severely curtail their operations. Functional integration has two important aspects, one involving product manufacture and the other concerning logistics and distribution of those products. GM utilizes specifically tooled parts and components in many of its automobiles and is the sole source supplier of these parts and components. If the supplier plant stops manufacturing its product, all of GM's production stops, as sole source products cannot be procured elsewhere.

As with product manufacture, logistics and distribution have some disadvantages. Efficient distribution depends on GM's "just in time" inventory system. With "just in time" inventory, products are delivered to GM plants just in time for assembly, thus eliminating the costs associated with maintaining large inventories. Although cost effective, this system can cause an assembly plant that is dependent on sole-source products to experience an immediate product shortage if the supplier stops production.

GM's functional integration system and the Delphi strike forced many GM assembly plants to cease operation temporarily, particularly the assembly plants in Lordstown, Ohio and Wentzville, Missouri. These plants depended on direct parts shipment from Delphi to operate. Without Delphi, they could not obtain the necessary brake components and had none inventoried to use until the strike ended. Ultimately, the lack of parts left appellees unemployed.

Although the Delphi strike had an intense impact on other GM plants, the strike settlement did not. The settlement did not change the terms and conditions of employment in the National Agreement, nor did it alter the terms and conditions of employment set forth in the Local Agreement. The strike settlement added two hundred seventy-five employment positions at Delphi, which could benefit union members if reassigned to that plant. Furthermore, only Local 696 members received strike fund payments from the International UAW even though all UAW members involuntarily contributed to the fund and all UAW locals could use the fund, including Local 1112, which represented Lordstown.

Appellees filed for unemployment benefits. The matter was referred to a staff hearing officer of the Ohio Bureau of Employment Services ("OBES"). A hearing was conducted on April 2 and 3 of 1996. Subsequently, on April 15, 26 and June 28, the hearing officer issued decisions, determining that union-represented employees at Delphi became unemployed due to a labor dispute other than a lockout. The hearing officer stressed that the resolution of issues raised during the Delphi strike *would reasonably be expected to affect* the resolution of the same or similar issues at Lordstown. The hearing officer found that appellees were therefore directly interested in the Delphi labor dispute, and consequently, were unemployed due to that labor dispute. Accordingly, the hearing officer held that appellees were not entitled to unemployment compensation.

Lordstown and Wentzville claimants filed separate applications for appeal with the OBES board of review on May 3, 1996 and July 19, 1996, respectively. The Board of Review disallowed the applications for appeal, thereby affirming the hearing officer's decisions. Appellees appealed separately to the Mahoning County Common Pleas Court. At this level, the two cases were consolidated for administrative purposes. The lower court reversed the board's decision, finding that appellees were entitled to unemployment compensation benefits, and ordered the administrator to pay appellees' claims. The within appeal followed.

At the outset, our standard of review on appeal must be discussed. R.C. 4141.28(O)(1) sets forth the standard of review to be applied in unemployment compensation cases and states as follows:

"If the court finds that the decision was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse and vacate such decision or it may modify such decision and enter final judgment in accordance with such modification; otherwise such court shall affirm the decision."

The Ohio Unemployment Compensation Act, R.C. 4141.01 *et seq.*, "does not create distinctions between the scope of review of common pleas courts and appellate courts." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Serv.* (1995), 73 Ohio St.3d 694, 696–697, 653 N.E.2d 1207, 1210. In reviewing the board's decision, an appellate court must apply the same standard of review as the lower court. Thus, an appellate court may reverse the board's decision only if it is unlawful, unreasonable, or against the manifest weight of the evidence. *Id.* at 697, 653 N.E.2d at 1210–1211. The court shall not make factual findings or assess a witness's credibility. *Id.* at 696, 653 N.E.2d at 1210, quoting *Irvine v. Unemp. Comp. Bd. of Review* (1985), 19 Ohio St.3d 15, 19 OBR 12, 482 N.E.2d 587. The court may only determine if the evidence supports the board's decision, and thus shall not conduct a *de novo* review. *Tzangas* at 696–697, 653 N.E.2d at at 1210–1211. Though deference is due the findings of an administrative body, an

appellate court is not bound to accept improperly drawn inferences from the evidence. *Univ. of Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 17 O.O.3d 65, 407 N.E.2d 1265.

■ The sole assignment of error alleged by appellant OBES and the first assignment of error alleged by appellant GM are similar in nature, and therefore, will be discussed together. They are, respectively, as follows:

"The lower court erred when it reversed the board's decision that the claimants were directly interested in the strike which caused their employment to lapse, thus disqualifying the claimants from receiving unemployment benefits."

"The trial court erred in reversing the finding of the unemployment compensation board of review which determined that the claimants were 'directly interested' in the labor dispute within the meaning of O.R.C. § 4141.28(D)(1)(a)(i)."

Appellants argue that the lower court applied an erroneous and illogical definition of "direct interest." Appellants argue that the International UAW and UAW locals have the same interest regarding outsourcing, noting that the International UAW Constitution (the "Constitution") implicitly provides that the interests of the International UAW and UAW locals are interwoven. The Constitution states:

"All members of the Local Union are also members of this International Union and subject to the orders, rulings and decisions of this International Union and the properly constituted authorities of the same." Article 6, Section 14, Constitution of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America, June, 1995.

Appellants argue that the language of the Constitution suggests that International UAW decisions are also decisions of UAW locals. Appellants contend that, logically, the lower court could not find that the International UAW's interest on outsourcing is not of direct interest to appellees, all UAW members.

Appellants stress that the creation of more jobs at Delphi increased transfer and relocation opportunities for *all* UAW members. Additionally, appellants note that negotiations over sourcing were conducted at a national level, and that the Delphi strike ended only after the highest ranking officials at GM and the International UAW met to discuss the sourcing issue. Jeffrey Smith, a GM employer with twenty-eight years experience in North American automotive operations labor relations, testified that "it is unprecedented that you'd have that level of the organization meeting over local issues." Appellants argue that this testimony evinces that outsourcing was of great interest to the International UAW and was not just a local issue.

Appellants contend that the lower court erred in interpreting R.C. 4141.29(D)(1)(a) to require GM to prove that appellees had a direct interest in the labor dispute when the statute required appellees to show that they were *not* directly interested in the labor dispute. Finally, appellants argue that the lower court interpreted the requalification provision of R.C. 4141.29(D)(1)(a)(i) so as to completely negate the disqualification provision of R.C. 4141.29(D)(1)(a). Appellants argue that if the focus on outsourcing was on the particular component part to be outsourced rather than on outsourcing generally, then no employees other than those manufacturing that component part could have a direct interest in the dispute.

By contrast, appellees argue that the lower court interpreted the phrase "directly interested" in R.C. 4141.29(D)(1)(a)(i) so as to give meaning to the word "directly." Appellees contend that considering the statutory language, the contextual setting, the policies underlying the law, and the interpretation other state courts have given to similar statutory language, the lower court logically defined the exception. Furthermore, appellees argue that states with similar statutes have found nonstrikers "directly interested" in a labor dispute only when their contractual rights have been directly changed as a result of the labor dispute.

Appellees contend that to be "directly interested" in the Delphi labor dispute, a practice, custom or contractual obligation had to exist requiring GM to extend provisions of the Local Agreement to those CBAs governing appellees. Appellees argue that R.C. 4141.29(D)(1)(a) required the lower court to inquire as to whether appellees were "directly interested" in the labor dispute, not as to whether the International UAW was "directly interested" in the dispute.

█ The objectives of the Ohio Unemployment Compensation Act (the "Act") are to ameliorate the burdens on employees suffering from involuntary unemployment and to provide them with short-term financial relief. *Baker v. Powhatan Mining Co.* (1946), 146 Ohio St. 600, 33 O.O. 84, 67 N.E.2d 714. *Baker* stressed at 605, 33 O.O. at 87, 67 N.E.2d at 717:

"It was pursuant to the high purpose and praiseworthy design above stated that provision was made for the accumulation of a fund by means of contribution exacted from employers for the benefit of those who suffer the loss of employment, not through any fault or choice of their own, but because they become the unfortunate and unwilling victims of adverse business and industrial conditions."

R.C. 4141.46 mandates that the Act be liberally construed to favor the persons benefited. The court in *Adamski v. Ohio Bur. of Unemp. Comp.* (1959), 108 Ohio App. 198, 204, 9 O.O.2d 220, 223, 161 N.E.2d 907, 913, elaborated:

"By 'liberal construction' is not meant that words shall be given an unnatural meaning, or that the meaning shall be enlarged or expanded to meet a particular state of facts. A liberal construction must still be a fair and reasonable one, in an effort always to ascertain the legislative intent."

By contrast, exceptions restricting the Act's scope must be strictly construed. *Armstrong v. Prophet Foods Co.* (1972), 31 Ohio Misc. 141, 60 O.O.2d 299, 287 N.E.2d 286.

R.C. 4141.29(D)(1)(a)(i) provides:

"Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:

"(1) For any week with respect to which the administrator finds that:

"(a) His unemployment was due to a labor dispute other than a lockout at any factory, establishment, or other premises located in this or any other state and owned or operated by the employer by which he is or was last employed; and for so long as his unemployment is due to such labor dispute. No individual shall be disqualified under this provision if either of the following applies:

"(i) The individual's employment was with such employer at any factory, establishment, or premise located in this state, owned or operated by such employer, other than the factory, establishment, or premises at which the labor dispute exists, *if it is shown that the individual is not financing, participating in, or directly interested in such labor dispute.*" (Emphasis added).

A claimant must establish his or her entitlement to unemployment compensation benefits. *Irvine, supra,* 19 Ohio St.3d 15, 19 OBR 12, 482 N.E.2d 587. Under the statute, a claimant's entitlement to such benefits hinges on whether his or her unemployment was due to a labor dispute other than a lockout occurring at a facility in this or any other state owned or operated by the claimant's employer. If a labor dispute caused a claimant's unemployment, that claimant is not entitled to unemployment compensation benefits, *unless* it is shown that he or she was "not financing, participating in, or directly interested in such labor dispute." This requalification provision furthers the Act's objective by providing financial assistance to employees who are unemployed through "no fault of their own."

As no Ohio court has construed the "directly interested" language of R.C. 4141.29(D)(1)(a)(i), the interpretation of this language is an issue of first impression before this court. Courts in other states with statutes similar to R.C. 4141.29(D)(1)(a)(i) have defined "directly interested." Although these cases are not uniform, the prevailing view is that a claimant must have something more that a general interest in a labor dispute. *Brobston v. Emp. Sec. Comm.* (1963), 94 Ariz. 371, 385 P.2d 239. That is, the labor dispute must affect directly a

claimant's specific contractual rights, usually regarding wages, hours or working conditions. *Id.*

In *Martineau v. Dir. of Division of Empl. Sec.* (1952), 329 Mass. 44, 49, 106 N.E.2d 420, 424, the Massachusetts Supreme Court emphasized:

"A person is 'directly interested' in a dispute when his wages, hours, or conditions of work *will be affected favorably or adversely* by the outcome. It is of no consequence that the person is not a member of the union conducting the strike or that he may not be in sympathy with its purposes." (Emphasis added).

In *Gen. Motors Corp. v. Bowling* (1981), 85 Ill.2d 539, 55 Ill.Dec. 836, 426 N.E.2d 1210, GM shop clerks were denied unemployment compensation after being laid off when GM production workers struck and caused a work shortage. Although employed at the same GM plants, different UAW locals represented the production workers and the shop clerks. The Illinois Supreme Court held that shop clerks were entitled to unemployment compensation benefits as they were not directly interested in the labor dispute. The court reasoned that customarily, certain parts of the national agreement would be included in the shop clerks' local agreement, and therefore, the shop clerks might anticipate that a strike settlement could alter their employment terms. Nonetheless, the court noted that the shop workers' interest in the strike was an indirect interest, at best. The court stressed, "All they had was a hope, not any assurance. A mere expectancy without any legal right, subject to GM's views on the fairness and convenience of adopting parts of another agreement, does not disqualify the shop clerks for unemployment benefits." *Id.* at 543, 426 N.E.2d at 1212.

In *Pottorff v. Unemp. Comp. Bd. of Review* (Pa.Commw.1996), 681 A.2d 244, the Unemployment Compensation Board of Review denied petitioner benefits when he became unemployed due to a labor dispute involving the International Brotherhood of Teamsters, a union of which he was not a member. The Commonwealth Court of Pennsylvania affirmed the board's decision, holding that petitioner was not entitled to benefits because he was directly interested in the labor dispute. The court defined a direct interest, stressing that "an employee is directly interested in a labor dispute if the wages and fringe benefits negotiated by the striking union cover all employees including the non-member claimants." *Id.* at 247, citing *Kearney v. Pennsylvania Unemp. Comp. Bd. of Review* (1985), 89 Pa.Commw. 404, 492 A.2d 790.

The Michigan Supreme Court further defined the term "directly interested" in *Burrell v. Ford Motor Co.* (1971), 386 Mich. 486, 492, 192 N.W.2d 207, 210. The court noted that a "reasonable expectation" that a labor dispute may affect an individual's wages, hours or working conditions "shall be deemed to exist, in the absence of substantial and preponderating evidence to the contrary: (I) if it is established that there is in the particular establishment or employing unit a

practice or custom or contractual obligation to extend * * * changes in terms and conditions of employment which are substantially similar or related to some or all of the changes in terms and conditions of employment which are made for the workers among whom there exists the labor dispute which has caused the individual's total or partial unemployment; or (II) if it is established that one of the issues in or purposes of such labor dispute is to obtain a change in the terms and conditions of employment for members of the individual's grade or class of workers in the establishment in which the individual is or was last employed."

Ultimately, the court held that claimants were not entitled to benefits based on reasoning irrelevant to the case *sub judice.* More important, however, are the court's findings that claimants were not directly interested in the labor dispute, because (1) the company had no practice, custom or contractual obligation to extend agreements made in one plant to another, and (2) the local labor dispute's purpose was not to change the working conditions of these claimants.

In *Brobston,* 94 Ariz. at 378, 385 P.2d at 244, Justice Jennings, in dissent, set forth the purpose behind the "directly interested" provision, stating:

"The purpose of the 'directly interested' provision was to eliminate the possibility of the key man strike—a device consciously employed by a union to impede production by removing a handful of workmen from an integrated operation. Without this safeguard all nonstriking union members thrown out of work by the ensuing strike shutdown would be entitled to compensation benefits although their interest in the strike was as great as that of the few strikers. Compensation in such cases would be tantamount to payment of strike benefits by the state in violation of it hypothetical neutrality in labor disputes."

Justice Jennings suggests that the "directly interested" provision be applied only to those workers whose wages, hours or working conditions will be automatically altered from the strike settlement compared to those workers whose wages, hours or working conditions may be altered or simply reviewed upon settlement.

In addition to determining whether a labor dispute will affect a claimant's wages, hours, or working conditions, courts must look to the nature of the labor dispute to determine exactly what contractual right is at stake. For instance, a strike settlement may involve compromising the terms of a national or a local CBA, and consequently, will affect different individuals. With national strikes, often an international union will call a strike of all its locals, or it may selectively strike certain locals, implementing a strategy which will maximize economic pressure. When a national agreement is negotiated, all members of an international union are affected and thus have a direct interest in the dispute. *Aaron v. Review Bd. of Indiana* (Ind.App. 1981), 416 N.E.2d 125.

Conversely, local problems may cause a local union to strike at a certain plant. Strike negotiations over terms in a local CBA affect only those individuals governed by that local agreement, although other members of the international union may have a general interest in the strike's end. If the terms and conditions of the national agreement are not at issue and the disputed local agreement does not govern or will not affect a claimant specifically, that claimant has only an indirect interest in the local strike. *Gen. Motors Corp. v. Review Bd. of Indiana* (1970), 146 Ind.App. 278, 255 N.E.2d 107.

In *Aaron, supra*, 416 N.E.2d 125, GM and the International UAW negotiated on UAW demands for changes in the terms and conditions of employment provided by a national agreement covering all GM union-represented employees. No local issues were discussed. With negotiations at a standstill, the dispute erupted into a nationwide strike. The International UAW led over three hundred twenty thousand GM employees at more than one hundred thirty-eight U.S. plants to strike. Pursuant to a planned selective strike strategy, the International UAW struck at all GM automotive production plants but exempted plants that produced parts for GM's competitors. Expectedly, the strike caused a work shortage and significantly curtailed employment at the exempt plants. Employees at these plants applied for unemployment benefits. The Indiana Court of Appeals held that the nonstriking workers at the exempt plants were not entitled to unemployment benefits because their unemployment resulted from a national strike. The court emphasized:

"[T]he so-called non-disputing workers at the exempt plants share in the benefits for which the strikers were militating. * * * To maintain that they were non-disputants merely by virtue of the geographic location of their work places is an arbitrary determination. The union elected to place the plants in question here on the exempt list. Its expressed tactical reason for so doing was to make it possible for exempted employees to serve the strike effort by producing parts for GM's competitors.

"There is here a joint effort by all the parties *to negotiate a single master contract* by which they are all bound and by which they all presumably benefit." (Emphasis added.) *Id.* at 130.

The *Aaron* court distinguished *Gen. Motors, supra,* 146 Ind.App. 278, 255 N.E.2d 107. There, strikes over local issues continued after GM and the International UAW reached a national agreement. Subsequently, some plants remained closed due to local strikes at other facilities. The court held that employees at the nonstriking plants were entitled to unemployment benefits. The court stressed the difference between a national agreement that altered the contractual rights of all union members and purely local agreements that affected the contractual rights of only those local union members.

Finally, in determining whether a claimant is "directly interested" in a labor dispute, R.C. 4141.29(D)(1)(a)(i) directs the fact finder to focus on a claimant's direct interest in the labor dispute. The statute does mandate that the fact finder determine the international union's direct interest in the dispute.

The Delphi strike was a local strike over local issues, including outsourcing, unquestionably a hotly debated topic, both locally and nationally. The International UAW's concerns over outsourcing emanated from its interest in membership retention, thus strengthening its highly political and economic position. Conversely, Local 696's interest in the strike encompassed the immediate and long-term effects the strike had on its members, particularly permanent job loss. Ultimately, Local 696 obtained authorization from the International UAW to strike at Delphi. The Delphi strike was not a national strike initiated by the International UAW, nor did the International UAW strike at Delphi as part of a national selective strike strategy. The Delphi strike was purely local. Thus, although the strike may have affected appellees indirectly, they were not "directly interested" in the strike. The strike would alter only the terms and conditions of the Local Agreement and would change neither the National Agreement nor the local CBAs governing appellees.

The lower court did not err in reversing the board's decision that appellees were directly interested in the Delphi labor dispute. The board based its decision that appellees were directly interested in the strike on two conclusory statements, neither of which logically defines "directly interested" in the context of R.C. 4141.29(D)(1)(a)(i). First, the board found that "[t]he lack of parts from Delphi Chassis certainly affected their interest in employment as it resulted in their being sent home from work." Second, the board determined that "[t]he resolution of issues raised during the Delphi Chassis labor dispute, including the outsourcing issue, *would reasonably be expected to affect the resolution of the same or similar issues at Lordstown Assembly* under the national and local agreements about to be negotiated between General Motors and the UAW." (Emphasis added.)

The board's first conclusion gives no effect to the word "direct" and therefore nullifies the "directly interested" provision of R.C. 4141.29(D)(1)(a)(i). One can safely assume that most unemployed workers have an interest in resuming work. However, the board's attempt to define "directly interested" with such a generalization is an effortless endeavor. Such a definition renders the phrase meaningless, as all those unemployed would be "directly interested" in the labor dispute that caused their unemployment, and no claimant would ever qualify for benefits.

A basic rule of statutory construction mandates that clear and unambiguous words be given their plain meaning. *Layman v. Ohio Dept. of Human Serv.* (1997), 78 Ohio St.3d 485, 678 N.E.2d 1217. If the board had construed the

statute as written, it would have been compelled to interpret the phrase "directly interested" as the legislature intended. That is, the board would have defined an "interest" as modified by the word "direct." To more clearly understand the statute's intent, an examination of the words contained therein is necessary.

The word "direct" means "operating by an immediate connection or relation, instead of operating through a medium." Black's Law Dictionary (5 Ed.1990) 459. In contrast, "indirect" means "[c]ircuitous, not leading to aim or result by plainest course or method or obvious means, roundabout, not resulting from an act or cause but more or less remotely connected with or growing out or it." *Id.* at 773. Furthermore, an "interest" is a "right, claim, title, or legal share in something; * * * a right to have the advantage accruing from anything." *Id.* at 812. Finally, to "affect" is "[t]o act upon; influence; change; enlarge or abridge." *Id.* at 57.

A claimant who is "directly interested" in a labor dispute is one whose rights are *immediately and proximately connected* with the dispute. Conversely, a claimant who reasonably expects that his or her rights may be "affected" by a labor dispute is *not* "directly interested" in that labor dispute, for the labor dispute may influence or change the claimant's rights indirectly. Judge Riley and Justice Jennings eloquently illustrate our position. In *Copen v. Hix* (1947), 130 W.Va. 343, 360, 43 S.E.2d 382, 390 (Riley, J., dissenting), Judge Riley defines "direct interest," stating:

"The interest contemplated by the statute must be active, direct and concrete. It must be in furtherance of the dispute by participation or activity therein by claimants, and must be prompted by a desire to secure higher wages, better working conditions, or some other material interest in the success of the dispute."

In *Brobston, supra,* Justice Jennings emphasizes:

"Thus, by substituting 'affected' for 'directly interested' the majority equates direct interest with 'mere' interest or even 'indirect' interest, thereby effectively repealing all statutory exceptions to the labor dispute provision when working conditions are an issue." *Brobston, supra,* 94 Ariz. at 377, 385 P.2d at 243 (Jennings, J., dissenting).

Thus, to be "directly interested" in a labor dispute, a claimant must have a stake in the labor dispute. The outcome of the labor dispute must proximately cause an alteration in a claimant's rights regarding wages, hours or working conditions. A reasonable expectation that the dispute's outcome will "affect" these rights fails to adequately define a "direct interest" and renders the statutory exception a nullity.

Additionally, the board's interpretation of "directly interested" negates the Act's objective. R.C. 4141.46 mandates that the Act be liberally construed to

favor those individuals unemployed through no fault of their own. Moreover, the Ohio legislature added the "directly interested" language in 1975 with an intent to clarify what constituted a disqualifying labor dispute. If workers unemployed due to a labor dispute could never qualify for benefits because by virtue of their unemployment they would be directly interested in such labor dispute, the Act itself would be meaningless.

The board's second conclusion is as unsubstantiated as its first. A claimant's expectation that a strike settlement will affect a new CBA is at best an indirect interest. The Illinois Supreme Court's decision in *Bowling, supra,* 85 Ill.2d 539, 55 Ill.Dec. 836, 426 N.E.2d 1210, is persuasive, as is the Michigan Supreme Court's decision in *Burrell, supra,* 386 Mich. 486, 192 N.W.2d 207. Although it was customary for parts of the national agreement to be included in the shop workers' local agreement, the *Bowling* court found that the shop workers had only an indirect interest in the national strike. The court emphasized that unemployed workers are not disqualified when they merely expect that the strike will alter their legal or contractual rights. Similarly, in this case, appellees had no assurance that the Delphi strike would alter their local CBA and consequently change their rights. In accordance with the *Bowling* decision, appellees were not "directly interested" in a strike which *may* have altered their rights under either their local CBA or the National Agreement.

In *Burrell, supra,* the court found that a claimant may be "directly interested" in a labor dispute upon a reasonable expectation that his or her wages, hours or working conditions could be affected *but only if* a "practice or custom or contractual obligation" to extend a settlement agreement among the striking workers to the nonstrikers existed, among other conditions. Absent those conditions, a reasonable expectation that the dispute may alter a claimant's rights is insufficient.

*Burrell* is distinguishable from this case. Most important, the record fails to establish that a practice, custom, or contractual obligation existed at GM that extended terms of one agreement to another. Thomas Danzey III, labor relations supervisor at GM, testified that Parma's UAW local had an agreement that addressed sourcing issues and supposedly resolved existing disputes over the issue. Nonetheless, sourcing remained a serious issue at Local 696. Had GM a practice, custom, or contractual obligation to extend parts of one agreement to another, sourcing issues at Local 696 would have ended upon resolution of such issues in Parma or other locals with similar agreements. Apparently, local settlement agreements are separate agreements applicable only to the actual contracting parties.

Moreover, Justice Jennings's position in *Brobston, supra,* 94 Ariz. 371, 385 P.2d 239, suggests that appellees would not be "directly interested" in the Delphi

strike for their wages, hours or working conditions were not altered automatically as a result of the strike settlement. Appellants' assertion that the strike settlement increased possible transfer and relocation opportunities for GM employees at other plants is but one example of an employment condition that the strike could alter but would not do so automatically. Furthermore, only Local 696 members received strike fund payments, and only Local 696 members shared in the monetary settlement over subcontracting.

Appellants argue that the terms of the International UAW Constitution suggests that the interests of the International UAW are interests of all UAW members. This broad inference does not fit succinctly within the context of the "directly interested" provision. A UAW membership hardly equates to a direct interest in every labor dispute which involves the UAW. If this were so, all UAW members would be "directly interested" in every local labor dispute, regardless of the circumstances. The International UAW, as an entity, does have an interest in local labor disputes. However, that does not mean that UAW members in the aggregate necessarily have an interest in local labor disputes. More important, R.C. 4141.29(D)(1)(a)(i) states explicitly that *the individual* must be "directly interested" in the labor dispute. The statute does not mandate a determination of the UAW's interests. Thus, appellants' reliance on the International UAW Constitution is misplaced and unsupportive of their argument.

Unconvincingly, appellants contend that high level negotiations that ended the Delphi strike confirmed that the International UAW was "directly interested" in the strike and evinced that this was more than a local strike over local issues. As discussed above, the International UAW is interested in local labor disputes by virtue of its host position among the UAW locals. However, appellants fail to look at the nature of the Delphi dispute and concentrate on merely one issue.

*Gen. Motors,* 146 Ind.App. 278, 255 N.E.2d 107, is persuasive. An Indiana appellate court awarded benefits to nonstrikers after concluding that they were not "directly interested" in the local strikes which continued after a national agreement was reached. There, the court distinguished national and local disputes as well as the issues involved.

The Delphi strike was not a strike over outsourcing alone but entailed other issues concerning health and safety, general grievances, manpower, and subcontracting. Outsourcing was the most apparent issue, however, due to its significant effect on Delphi employees. GM's plan to outsource brake components from Bosche would cripple Delphi and result in immediate and possibly permanent job loss for those employed there.

Although outsourcing was a pertinent issue to Local 696, it was important to the International UAW also. GM's highly integrated structure suggests that the International UAW would be interested in the Delphi strike because of its effect

on other locals and overall membership, which consequently could harm it economically. Nevertheless, the International UAW could not call a national strike over outsourcing. The National Agreement prohibited national strikes over outsourcing; whereas the Local Agreement did not. Furthermore, there was no evidence that the International UAW took a national strike vote over the outsourcing issue. Taken together, these agreements imply that the Delphi strike was a local strike, although the issue concerned both governing bodies.

Appellants contend that because the International UAW could not strike over outsourcing, it masked a national strike behind the local strike at Delphi, knowing fully that striking at Delphi, the sole source brake supplier, would significantly halt GM's operations. Appellants fail to grasp that the Delphi strike was not over outsourcing generally, but concerned specifically the outsourcing of brake components. Outsourcing brakes would have a direct and long-term effect on Delphi employees who faced permanent job loss but would affect appellees only indirectly, as they faced temporary layoffs. Once GM began outsourcing brakes, it would supply appellees with the necessary brakes to resume assembly. Appellees' interest in the strike's end so that they could return to work did not make them "directly interested" in the labor dispute.

Appellants argue that the lower court interpreted "directly interested" so as to negate the disqualification provision of R.C. 4141.29(D)(1)(a). Appellants are wrong. Giving precise meaning to the word "directly" intensifies not only the disqualification provision but the entire statute. Consistently, the lower court preserved the legislature's intent to liberally construe those provisions that favor claimants and to narrowly construe those provisions which do not. Had the lower court focused on outsourcing generally and not on the part outsourced, as appellants contend, every union member would be "directly interested" in every outsourcing issue which arose.

Finally, appellants aver that the lower court required GM to prove that appellees were not "directly interested" in the labor dispute when the statute puts that burden on the claimant. Appellants' argument is unpersuasive. The lower court stated correctly that appellees had the burden of proving their entitlement to benefits and accordingly weighed all the evidence before determining that appellees were not "directly interested" in the Delphi strike.

The lower court did not err in reversing the board's decision that appellees were "directly interested" in the labor dispute. The board's decision was unreasonable, unlawful, and against the manifest weight of the evidence. The Board's interpretation of R.C. 4141.29(D)(1)(a)(i) is unlawful, as it left meaningless the vaguely phrased "directly interested" provision and ignored the legislature's intent to liberally construe the statute. Furthermore, the board based its decision on two unreasonable and conclusory statements, neither of which is

substantiated with either law or fact. This court is not bound to accept these improperly drawn inferences. Finally, the board's decision is against the manifest weight of the evidence, as the evidence establishes the inverse of what the board holds. The evidence suggests that the Delphi strike was a local strike over local issues, involving only Local 696 directly.

Applying the persuasive decisions of other jurisdictions, this court finds that appellees were not "directly interested" in the Delphi strike. First, the strike did not affect appellees' wages, hours or working conditions, nor did GM have a practice, custom, or contractual obligation to extend terms of the Local Agreement to the agreements which governed appellees. Second, the strike was a local strike. Local 696 struck at Delphi upon authorization from the International UAW; the International UAW did *not* implement the strike and, therefore, appellees cannot be implicated in it automatically.

Appellants' first assignment of error is without merit.

It is more appropriate to address appellants' third assignment of error before its second. Appellants' third assignment of error alleges:

"The trial court erred in finding that the claimants did not 'finance' the labor dispute within the meaning of O.R.C. § 4141.29(D)(1)(a)(i). (Judgment Entry, February 18, 1997)."

Initially, appellees argue that appellants should not be permitted to raise their third assignment of error on appeal because they failed to preserve it through cross-appeal. Appellees note that appellants had two opportunities prior to this appeal to cross-appeal the financing issue but raised the issue only after the lower court reversed the board's decision that appellees were "directly interested" in the Delphi strike. Appellees contend that appellants' failure to raise this issue below has prevented proper review of the issue up to this level and, accordingly, the court should dismiss the issue. Alternatively, appellees urge this court to review the issue on its merits and affirm the board's decision that the payment of regular union dues does not constitute "financing" of a labor dispute within the context of R.C. 4141.29(D)(1)(a)(i).

App.R. 3(C) states:

"(1) *Cross appeal required.* A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order, shall file a notice of cross appeal within the time allowed by App.R. 4.

"(2) *Cross appeal not required.* A person who intends to defend a judgment or order appealed by an appellant on a ground other than that relied on by the trial

court but who does not seek to change the judgment or order is not required to file a notice of cross appeal."

Appellees' argument that the "financing" issue was not properly reviewed below is unpersuasive. The hearing officer's decision disqualified appellees from receiving unemployment compensation benefits. In reaching this decision, the hearing officer considered whether appellees were participating in, financing, or directly interested in the labor dispute. However, the ultimate decision was that appellees were denied benefits. Appellants never sought to change this judgment until now; thus, they were not required to cross-appeal the issue below. This court shall review appellants' third assignment of error on the merits.

Appellants argue that appellees' payment of union dues constituted "financing" of the labor dispute. Appellants contend that although no Ohio law exists on this issue, state courts with similar statutes have found that payment of union dues constitutes "financing" of a labor dispute. Furthermore, appellants note that those state statutes which explicitly prohibit construing the payment of union dues as "financing" of a labor dispute predated the December 1975 passage of R.C. 4141.29(D)(1)(a)(i). Appellants argue that the legislature's omission of this specific statutory restriction manifests its intention that the payment of union dues could constitute "financing" of a labor dispute.

Ohio courts have yet to determine what constitutes "financing" of a labor dispute. Accordingly, this court will look to other state court decisions which have defined similar statutory language. In *Bowling, supra*, 85 Ill.2d 539, 426 N.E.2d 1210, the Supreme Court of Illinois found that shop clerks who paid regular union dues, part of which went to the International UAW's strike fund and was used to support striking workers, were not "financing" the labor dispute. The court held that "the payment of money is not 'financing' a labor dispute unless there is a meaningful connection between the payment and the dispute, such as a purpose to support the strike." *Id.* at 545, 426 N.E.2d at 1213, citing *Baker v. Gen. Motors Corp.* (1980), 409 Mich. 639, 297 N.W.2d 387. The court reasoned that the shop workers did not pay their regular union dues in order to aid the present strike. Instead, the court noted, the shop workers paid their union dues to insure monetary support in the event of their own labor dispute. The court emphasized that "[t]he strike fund is a sort of private insurance against unemployment due to strikes. One does not pay insurance premiums to finance other people's claims, but to provide for one's own need." *Bowling* at 545, 426 N.E.2d at 1213.

Section 29(8) of the Michigan Employment Security Act provides:

"(ii) The payment of regular dues, in amounts and for purposes established before the inception of the labor dispute, shall not be construed as financing a labor dispute within the meaning of this subparagraph."

In *Baker, supra,* the Michigan Supreme Court distinguished between regular union dues and emergency dues used to supplement the strike insurance fund. The court found that the term "regular" had been used "to exclude from possible treatment as financing those dues payments required uniformly of union members and collected on a continuing basis without fluctuations promed by the exigencies of a particular labor dispute or disputes." The exception for regular union dues thus did not encompass "unusual collections for the purpose of supporting a labor dispute." *Baker, supra,* 409 Mich. at 666, 297 N.W.2d at 398.

On appeal, the United States Supreme Court noted that "[s]pecifically, we have no occasion to consider the circumstances, if any, in which individuals might be disqualified solely because they paid regular union dues required as a condition of their employment." *Baker v. Gen. Motors Corp.* (1986), 478 U.S. 621, 638, 106 S.Ct. 3129, 3138, 92 L.Ed.2d 504, 519.

In *Soricelli v. Bd. of Review, Div. of Emp. Sec., Dept. of Labor & Industry* (1957), 46 N.J.Super. 299, 134 A.2d 723, the court found that a claimant who contributed $1 to a *voluntary* strike fund used to assist an affiliated local was "financing" a labor dispute.

Following *Bowling, supra,* 85 Ill.2d 539, 426 N.E.2d 1210, both the board and the lower court found that appellees' payment of regular union dues did not constitute "financing" of the Delphi labor dispute. This decision was not unreasonable, unlawful, or against the manifest weight of the evidence and should be affirmed. The board determined that no direct relationship existed between the dues paid and the strike, that *appellees established no special assessment or strike fund,* and that *appellees neither collected goods nor money with which to assist the strikers.* The lower court noted that the International UAW manages and controls the strike fund and decides who will receive strike assistance and in what amount. Moreover, the lower court emphasized that the International UAW's decision to finance a strike should not be imputed to individual locals who oppose such financing but nevertheless are required to pay their dues to retain UAW membership.

Our decision that the regular payment of union dues does not constitute "financing" of a labor dispute is consistent with the purpose of Ohio's Unemployment Compensation Act. The Act protects those claimants unemployed through no fault of their own. Such a broad interpretation would negate the Act's overall purpose and the specific purpose of R.C. 4141.29(D)(1)(a)(i). Any union member who paid regular union dues would be disqualified from receiving benefits, regardless of his or her opposition to the strike.

Michigan law suggests that the payment of money other than regular union dues coupled with a meaningful connection to the strike constitutes the "financing" of a labor dispute. The record evinces that appellees' union dues were not increased and a separate collection was not established in anticipation of a strike. Darrell Bowling, administrator of strike benefits for the International Union Secretary Treasurer's office, testified that the UAW Constitution allowed members to *directly* finance a strike. Bowling testified as follows:

"Q: Okay. Darrell is there another way that a local union can contribute directly to the strike insurance fund to support locals that have been on a long-term strike?

"A: Say that again, Fred.

"Q: Is there a way that locals can contribute to support the members who have been on strike for a long period?

"A: Yes, yes, there is.

"Q: And how is that done?

"A: That money goes to the secretary treasurer's office in Detroit which is a separate fund and when the local needs the money then they'll call there and they'll give them the money. It's not in the strike insurance fund. It's separate.

"Q: Okay. And do you know whether Local 1862 at Mosler had such an account?

"A: No.

"Q: Okay. Have you had experience where you distributed money from that account?

"A: I never have.

"Q: Do you know whether any local unions in Ohio contributed any money in the fashion you just discussed to local 696?

"A: Not to my knowledge."

Bowling's testimony confirms that union members can voluntarily and actively finance a strike from payments other than regular union dues. All money contributed to this separate fund is earmarked for strike assistance and held apart from the International UAW's strike insurance fund. In contrast, regular union dues are distributed as follows: thirty-eight percent to the local unions, thirty percent to the International UAW's strike insurance fund, and thirty-two percent to the International UAW's administrative fund. Union members must pay union dues to retain membership. They have no choice as to how the International UAW distributes dues incomes and thus passively contribute to the International UAW's strike fund. To find that all claimants who pay regular

union dues are "financing" a labor dispute would leave R.C. 4141.29(D)(1)(a)(i) meaningless. Logic would suggest that when the legislature added this exception to the statute, it intended for it to have a precise meaning. That is, a claimant should be actively and directly "financing" a labor dispute before that claimant is disqualified from receiving benefits.

Finally, appellant argues that the legislature intentionally excluded language from the statute indicating that payment of regular union dues does not constitute the "financing" of a labor dispute. Appellant further asserts that the absence of such language evidences the legislature's intent to treat the payment of regular union dues as "financing" a labor dispute. Appellant cites no authority supporting such an interpretation. A more reasonable explanation for the absence of such language is that the legislature intended to give courts more freedom to consider multiple factors than simply one dispositive situation.

Appellants' third assignment of error is without merit.

Appellants' second assignment of error alleges:

"The trial court erred in reversing the decision of the unemployment compensation board of review because those decisions were not 'unlawful, unreasonable, or against the manifest weight of the evidence' as required by O.R.C. § 4141.28(O)(1)."

Appellants argue that the standard of review on appeal prohibits a reviewing a court from making findings of fact or substituting its judgment for that of the administrative agency. Appellants contend that the lower court ignored competent, credible evidence which supported the board's decision that appellees were "directly interested" in the labor dispute. Finally, appellants argue that the lower court improperly substituted its judgment for that of the board by making unsupported factual findings regarding appellees "direct interest" in the labor dispute.

This court has addressed the above arguments in its review of appellants' first and third assignments of error. Additional discussion on these matters would be repetitive and is unnecessary.

As noted above, the lower court did not err in reversing the board's decision, as that decision was unlawful, unreasonable, and against the manifest weight of the evidence.

Appellants' second assignment of error is without merit.

Appellants' fourth assignment of error alleges:

"The trial court erred in concluding that claimants employed at the Lear Seating Plant are entitled to unemployment compensation benefits."

Appellants argue that the UAW stipulated to a list of claimants employed at the Lordstown Assembly Plant, some of whom became employed at the Lear Seating plant. Appellants argue that the trial court erred in finding that the Lordstown and Wentzville claimants were not entitled to benefits, which suggests that similarly, employees at Lear Seating were not entitled to benefits also.

Conversely, appellees argue that Lear Seating is a separate plaint which the Delphi strike affected only indirectly. Appellees emphasize that the Lear Seating facility resembles more closely other GM component manufacturers whose employees were awarded benefits, and therefore, employees at Lear Seating should receive benefits even if this court reverses the lower court's decision.

The lower court held that whether Lear Seating is a separate plant whose employees were entitled to benefits is a factual issue which the board should resolve on remand. Nonetheless, the lower court correctly found a remand to be pointless based on its decision to reverse the board's conclusion and award appellees unemployment benefits.

Appellants' fourth assignment of error is without merit.

The judgment of the lower court is affirmed.

*Judgment affirmed.*

VUKOVICH and WAITE, JJ., concur.